CLEMENT v. RILEY.

1. No connection between slaves could be considered as a legal marriage in such sense as to become the source of legal heirs at law. But where the ceremony of marriage between two slaves was performed by a clergyman, and they continued to live together as man and wife until

after 1872, they thereupon, under the operations of the statute of that year, legally became "husband and wife and entitled to all the rights and privileges of that relation." And upon the death thereafter of the husband intestate, the wife was entitled to her proper share of his estate under the statute of distributions.

2. It was not the intention of the acts of the legislature, establishing and regulating the domestic relations of persons of color to legitimatize the whole colored race, but only to legalize such marriages as were morally good, but not legal for want of power in slaves to make a binding contract. Where two slaves of the same plantation lived together for many years without any public ceremony of marriage or any conduct or declarations pointing unmistakably to a previous contract of marriage, and then separated, the issue of such connection are not the legal heirs of their father.

3. Where slaves were morally man and wife, and had issue, and the man afterwards took another woman for his wife, the first wife being still alive, and not separated from him by removal of either by the master's power, the second connection was illicit, and its issue has not been made legitimate by any statute. Children of the first marriage could never, therefore, inherit from this illegitimate issue of the second connection.

4. Where a man slave married a woman slave, the mother of several children, and there was an issue of such marriage, who died intestate in 1885, leaving a widow but no children, the half brothers and sisters of this intestate are entitled to one moiety of his estate, all being the legitimate children of the same mother, under the provision of the act of 1865, "that every colored child heretofore born is declared to be the legitimate child of its mother."

Before HUDSON, J., Charleston, November, 1889.

This was an action by Abram Clement and others against Molly Riley, administratrix of S. B. W. Riley, deceased, Isaac Snipe, and others, commenced in February, 1887. The testimony in the case was as follows:

### PLAINTIFFS' EVIDENCE.

*Abram Clement:* I live at Mr. Nelson's place on John's Island. I knew Stephney Riley. He was my brother. We were the children of the same parents. My father's name was Isaac Clement, and my mother's name Patty Clement. I had other brothers and sisters—first Saul, then Diana, then Gabriel, then myself, Abram, then Stephney Riley. He was the youngest. I minded

Stephney Riley when he was a little boy, and took care of him. Those were all the children my father and mother had. Isaac and Patty Clement belonged to Mr. Henry Bailey. They lived on Edisto. They both died before the war. They were living together when they died, and had been living together all their lives as man and wife.

X. I was born on Eddings Bay, Mr. Bailey's summer residence on Edisto. My mother was a cook. My mother's name, Patty Clement, and my father's, Isaac Clement. I am about fifty years old. My father lived on the same place with my mother. They had five children altogether, all by the same mother and father. Isaac Clement died before my mother, about thirty years ago. I was the next to the youngest child. I know that all the children had the same father and mother, because my mother and father were honest, upright people. My mother never belonged to any one else but Mr. Bailey from the time I knew her.

XX. I never heard it questioned by any one, whether any one of my brothers and sisters had any other father than Isaac Clement.

*Richard Bowman:* I live at Mr. Nelson's place on John's Island. I have been living there for the last eight years. I knew Stephney Riley. I knew his father and mother; their names were Isaac and Patty Clement; I knew them from a boy. Isaac was a coachman and Patty a cook, and I was waitingman for Mr. Wm. Seabrook. Isaac and Patty belonged to Mr. Henry Bailey. I knew their children; they had five children—Saul, Diana, Gabriel, Abram, and Stephney. Stephney was the last. Isaac had no other children, to my knowledge, and I knew him from boyhood. I knew him before he married Patty. He never had any other wife but Patty. They always lived together as man and wife, and died so.

X. I am about eighty years old. I never lived on Mr. Bailey's place. Patty was named Patty Clement. She went by her husband's name, Isaac Clement. I knew Patty before she was married; when she was a little girl. She never had any husband but Isaac Clement. I am certain that all the children I mentioned were both her's and his.

*Samuel Clement:* I am the son of Saul Clement. Stephney

Riley was my uncle, my father's brother.  My grandfather and grandmother were Isaac and Patty Clement.  I did not know them personally, for they died before I was born, but I always heard in the family that they were as I have stated.  I knew Stephney Riley personally; he recognized me as his nephew, and I worked with him in Charleston as a driver for two years after the war.  Stephney Riley always treated me differently from the other stable boys.  I ate at the same table with him, and none of the others did so.  My mother is alive.  She is the widow of Saul Clement.  The children of Saul Clement are myself, Samuel, Isaac, Gabe, Saul, and Lyddy.  All are alive, and all of full age.

X. My father's father and mother were Isaac and Patty Clement.  I know no such person as Jack Simons.  I lived on Mr. Wm. C. Bailey's place at one time.  When I first worked with Riley, my father put me to work with him.  I was about 20 years of age, I think.  Riley paid me nothing.  I used to eat with Riley, and sometimes other gentlemen.  Sometimes some white gentlemen used to come in and dine with us.  I never dined at the same table with any of the white gentlemen.  I often dined with him when plenty of colored ladies were at the table.  His wife, Molly, sat at the table with me often.  She had been living with him since before the war.

*Diana Young:* I knew Stephney Riley.  He was my uncle. His father and mother were Isaac and Patsy Clement.  Riley left a widow, but no children.  He left four brothers and sisters— three brothers and one sister.  Their names were Saul Clement, Abram Clement, Gabe Clement, and Diana Clement.  Isaac and Patsy Clement belonged to Mr. Henry Bailey.  They died before the war.  Patsy survived Isaac.  They lived together up to Isaac's death.  I never heard of Isaac having any other wife than Patsy. She was the first and the last.  Isaac had no other children than Riley and the brothers and sisters I have named.  I am the daughter of Gabe Clement.  My father is dead.

X. I am about 40 years old.  I remember when Isaac Clement died.  I was then about 10 years old.  My grandmother, Patsy, was his wife.  She was Mr. Bailey's cook, and my grandfather, Isaac, was his coachman.  Stephney Riley was older than I.  He

was my uncle. He and my father were full brothers by the same father and mother.

XX. I knew Stephney Riley well. I have lived with him till I was partly grown, and he raised me. I used to carry his meals to him. I was his pet. I stayed in his house for over 8 or 10 years.

### DEFENDANT'S EVIDENCE.

*Isaac Snipe:* I am over 60 years of age. I was born on Edisto Island, and am now living at No. 20 Magazine street, Charleston. I have been living here since the war. I was raised on Edisto, at Mr. Edward Bailey's place. My father's name was Isaac Snipe, and my mother's name Hannah Snipe. My father died first, and my mother afterwards. My father died about 10 years before the war. My mother, Hannah, died on Wadmalaw Island about 12 or 13 years ago. My mother belonged to W. C. Bailey. I had two sisters, Scylla and Doll, and one brother, Morris. The father and mother of Scylla, Doll, and Morris were Isaac Snipe and Hannah. Scylla never married. Doll married, and is dead. She left one child, a girl. I don't know where she is. My brother died 3 years ago in Charleston. He left a wife, Charlotte, now living on Wadmalaw, and one son named Robert, who is also there. I don't think there are any other children. I remember a woman named Patsy on Mr. Bailey's place. Mr. Bailey bought her about 30 years before the war. When she came there, her name was Patsy Clement. She came there with several children; Saul was one, Penny was another, Gabe was the last. At the time she came there, my father was living with my mother, Hannah, but after awhile he left her and took up with Patsy. They had one child—Stephney Riley. I was on the same plantation with Stephney till he was grown up. He had no other name that I knew of but Stephney. He is the same boy who was afterwards known as Stephney Riley, and died under that name. Stephney and I had the same father, but different mothers. I don't know who the father of Patsy's former children was. She brought no husband with her. I don't remember exactly how old the children were. Saul was, I think, about 15 when his mother came to Mr. Bailey's. He was known as Saul Clement. I am not certain about the others. My father was Mr. Bailey's coachman

and driver over the hands. I know positively that my mother was alive when Stephney was born, and that she survived my father, Isaac Snipe.

X. Hannah continued to live on Mr. Bailey's plantation, and died there. I think I am about 60 or 70 years old. Patty was bought about 30 years before the war. I then was a three-quarter hand in the field, and think I was about 15 years old. I recollect the three children Patsy brought with her. My mother, Hannah, was raised by Mr. Bailey. Patty came from somewhere in St. John's.

*Jack Simons :* I live at 132 King street, Charleston. I am about 68 years old. I was born on Edisto Island, came to Wadmalaw, and lived there 9 years. I lived at Mr. Tom Bailey's place, alongside of Mr. Edward Bailey's place. I have known Isaac Snipe from a child. His father was old Isaac Snipe, who was Mr. Edward Bailey's mother's coachman, and after the division of the estate, Mr. Henry Bailey got him, and he drove for him. I am no relation to any of the parties to this suit. The mother of the present Isaac Snipe was named Hannah. Hannah had two daughters and another son—Morris—older than Isaac. Morris died here in town. I don't know if he left any children. I think old Isaac Snipe died before Hannah. Hannah has been dead a good while, but I am positive it was after Snipe. I knew Patty Clement when she came to Mr. Bailey's; she brought three boys, and had one born afterwards, named Abram. Abram's father came to Mr. Bailey's, but didn't stay there. He was an outside man, a man from St. John's. I think Abram was born shortly after she came there. Abram's father came there sometimes, but he couldn't stay there. Isaac had Patty, and wouldn't let him stay. Mr. Bailey would do anything for old Isaac. Isaac Snipe had one son by Patty, and no more. Stephney was his name, and he was known afterwards as Stephney Riley. Hannah was alive at the time that Isaac was living with Patty. Saul Clement was about 16 years old when he came to Mr. Bailey's place with his mother. I was then about 13.

*Molly Riley :* Stephney Riley was my husband. I was married to him before the war, at Calvary church, by Rev. Paul Trapier, an Episcopal clergyman. Before I was married, I belonged

to Miss Susan Minott. Riley belonged to some of the Hanna-hans. I lived with Stephney Riley from the time of my marriage until his death. I had no children. I do not know of any of his family, or what his relatives were. They were not at my wedding. Diana Young was at our house as a servant for some time, but she did not suit me, and was dismissed. They never sat at the table with us.

*Molly Ann Fenwick:* I was born in St. Helena Parish. I am pretty old, but can't say how old exactly. My husband's name was Jacob Fenwick. He is dead. I live on Washy Clark's place, on John's Island. I used to live on Mr. Edward Bailey's place years ago. I know Stephney Riley, and knew him when he was born. He grew up on Mr. Edward Bailey's place. His mother's name was Patsy, and his grandmother's Lyddy. His father's name was Isaac Snipe. Patty came to the Bailey place with three children—Gabriel, Saul, and Penny. Their name was Clement. She had one child named Abram before she had Stephney. Abram's father was named Watty, and belonged to Major Murray. Riley was the next child, and Snipe was his father. Clement, Patsy's first husband, was left behind when she came to Mr. Bailey's. Clement had a different owner from Patty. His owner was Miss Jones. Clement came to the place, and had a great row with Snipe because he had his wife. Snipe got up a great crowd of men and came to the house, and master sent me down to ask Clement where he had been all that time, and master gave him a day to get off the place. He went away the same day. I know that Watty was Abram's dad, because I was with them all the time. Watty took no account of Abram, but left him just there.

X. Patty and I both lived on Edward Bailey's place. Patty was the cook. Mr. Edward Bailey bought her from Miss Jones. Snipe belonged to Edward Bailey at the time he was the father of Riley. Patty brought three children with her to Mr. Bailey's, and Clement was the name of their father. I lived on Mr. Bailey's place, since I was a girl, till the division of the negroes among the heirs. I lived till then on Mr. Edward Bailey's place.

XX. Before Riley was born, Snipe had two boys, named Isaac and Morris, and two girls, Scylla and Doll. All these four chil-

dren were by Hannah, and were born before Riley. Hannah was alive when Patty came on the place, and Snipe left Hannah for Patty. Hannah was alive when Riley was born.

*Hannah Ford:* She is quite old; about eighty years of age. She knew Stephney B. W. Riley from early childhood. He belonged to Mr. Henry Bailey, and I to Mrs. Henry Bailey. Stephney Riley's father was Isaac Snipe, the driver for Mr. Bailey. His mother was named Patsey. Stephney Riley was the only child of Isaac Snipe and Patsey. Patsey had three boys and one girl before Snipe lived with her. Mr. Bailey purchased Patsey and these four children from some estate, and brought them to his plantation. The father of the children, though, he did not buy. Isaac Snipe took up with Patsey after Mr. Bailey brought her to his plantation. Isaac Snipe had other children by other women on the place. Mr. Henry Bailey married my mistress, Miss Mikell. They are both dead. Mr. Bailey died before the war, and Mrs. Bailey during the war. All their children are dead. Mr. Bailey sold Riley to Mr. Hannahan after he came to manhood.

*Flora Johnson:* I live at Powell Lawton's place on James Island. I am very old; don't know my exact age. I went to Mr. Edward Bailey's place when I was about 15 years old. I minded Miss Susan Bailey, and waited as a maid on Miss Sarah Bailey. I remember when Patsy came to Mr. Bailey's place. The boss bought her with three children, two boys, Saul and Gabriel, and a girl named Penny. They were with Patsy when she came there. When she was at Mr. Bailey's place, she had a boy, Abram. I don't know by what father. After that she had Stephney Riley. His father was old Snipe. Patsy's husband, that she left behind her when she came to Mr. Bailey's, came to the place once, and there was some row between him and Isaac Snipe, and the boss ordered him off, and I never saw any more of him. I knew Patsy well. She didn't speak much, and had little to say. Before Patsy was bought, Isaac Snipe had a wife named Hannah. She was dead when Patsy came on the place. He had a son by Hannah named Isaac Snipe. We all were living on the same plantation, and I knew them all.

*Daniel Glen:* I am about 65 years old. I was the coachman

of Mr. W. C. Bailey. I knew an old man named. Isaac Snipe. He belonged to old Mr. Edward Bailey, and was his coachman. After the estate was divided, Mr. Henry Bailey drew him and brought him on James Island. Isaac Snipe's first wife was named Hannah. He had four children by her—Morris, Isaac, Scylla, and Doll. Afterwards Uncle Isaac and Aunty Hannah separated, and about a year afterwards Patsy, who had been bought one or two years before the separation, took up with Isaac. She had four children before she took up with Isaac—Penny, Saul, Gabe, and Abram. Abram's father was different from the other three, but Abram was a good sized boy when Isaac took Patsy. The only child Isaac had by Patsy was Stephney Riley. Stephney Riley never had a whole brother or sister, but his mother and father each had four children before they were married to each other. I lived on the same place with Hannah—on Wadmalaw. She died there. Mr. William Bailey drew Hannah and me at the division, and took us to Wadmalaw. I can't say what year Hannah died, but she died after Uncle Isaac. Hannah was alive when Stephney Riley was born, and she was alive when Stephney was sold. He was then a man. I am positive that Hannah survived old man Snipe.

S. H. Jenkins: I am in my 61st year, and reside at Rockville, Wadmalaw Island. I knew Stephney Riley and his father. His father's name was Isaac Snipe, and his mother's name was Patsy Clement. There were no other children of both Isaac Snipe and Patty Clement. The other children of Patty Clement were Saul, Gabriel, Abram, and Penny. They were by another father. They came with Patty when she came on the Bailey place. I knew Isaac Snipe, the elder, the father of Riley. I know of no other children of his but Stephney Riley. He had no such son on the place. I knew all the people on the place. Isaac Snipe, the elder, was a privileged character. I have heard of his having another wife named Hannah, but I did not know her. I never heard of his having any children by Hannah. I don't remember Hannah being on the place. Isaac Snipe and Patty Clement lived together as man and wife, according to plantation custom, for many years, and he was living with her when he died. He

died long before the war.   He was on Henry L. Bailey's place, on James Island.

All other matters are stated in the opinion.

*Messrs. Rutledge & Rutledge* and *T. M. Mordecai,* for plaintiffs, appellants.

*Mr. John Wingate,* for the Snipe defendants, appellants.

*Messrs. Buist & Buist,* for respondent.

June 26, 1890.   The opinion of the court was delivered by

MR. JUSTICE MCGOWAN.   S. B. R. Riley, commonly called Stephney Riley, a man of color, died in October, 1885, intestate, leaving, as stated, personal estate more than enough to pay his debts.   He left a widow, Molly Riley, but no children or lineal descendants.   The widow, Molly, administered, and being in possession, claims the whole estate as sole heir.   This action was instituted against her for an account by the plaintiffs, the Clements, claiming to be brothers and sisters, or their children, of the intestate, through their mother, Patty, or Patsy, Clement; making parties defendant the Snipe children, who claim to be brothers and sisters of the half blood through their father, one Isaac Snipe.   The parties are all colored people, formerly slaves, and the question is, whether any of them, and, if so, who, are the heirs at law of the intestate, Stephney Riley.

It was referred to the master, G. H. Sass, Esq., to take the testimony and to report upon all the issues of law and of fact, with leave to report any special matter.   He took a mass of testimony, which is all printed in the "Brief," and reported, among other things, as follows :  "Isaac Snipe, the elder, a slave, lived on Mr. Bailey's plantation, on James Island, for years before the late war.   He died long before the war in slavery.   He left surviving him several children, the Snipes and Stephney.   The Snipes were the children of a woman named Hannah ; Riley of Patty or Patsy Clement.   Patsy was bought by Mr. Bailey from a plantation in St. John's Parish, and brought to his plantation. She had several children, the Clements, plaintiffs herein, when

she came to the Bailey place. They were by another father (probably other fathers) than Snipe; and the father of at least one of the children afterwards went to the Bailey place in search of her, but was driven off by Snipe, with whom she was then living. When Patty came to the Bailey place, Hannah was still alive, and it seems from the weight of the testimony that she was still living with Snipe, though some of the witnesses say that Snipe had separated from her before Patty's coming. Be that as it may, however, shortly after Patty's coming, Snipe left Hannah and 'took up' with Patty, and Isaac and Patty thereafter lived together as man and wife, according to plantation custom, for many years, and he was living with her when he died. Stephney Riley was the only child of Patty and Isaac. Hannah, the mother of the Snipe children, was alive at the time of Riley's birth, and, indeed, outlived Isaac Snipe; but Isaac never returned to her. He left her definitely, and took Patty as his wife, and his marriage to Patty was recognized by their owner, Mr. Bailey, who, when Patty's former husband came to the plantation after her, supported Snipe against him, and ordered him off the place. Riley was subsequently sold and removed to Charleston. On December 23rd, 1853, he was married to Molly, a slave, by the rector of Calvary Episcopal church, and lived with her as his wife to the day of his death. They never had any children, and Molly survived her husband, and is defendant herein. Riley accumulated property after the war, and this suit is brought by the Clements, the children and grandchildren of Patty, claiming one moiety of the same as the half sisters, by the mother's side, of Riley, who died intestate, against the widow and the Snipes (children of Hannah), who claim as the half brothers and sisters of Riley, by the father's side. If the claim of the half blood be sustained, the widow is entitled to one moiety, and the half blood to the other moiety. If no half blood relationship (and no other is set up), the widow takes the whole estate," &c. He held that Isaac and Hannah were not husband and wife, and, therefore, that the Snipes were not legitimate, but that Isaac and Patty were husband and wife, and their issue, Riley, was legitimate, and the plaintiffs (Clements) were brothers of the half blood

through their mother, Patty, and entitled to one moiety of the estate, the other going to the widow, Molly.

Both the widow, Molly, and the Snipes children excepted to the report, and, upon argument, the Circuit Judge held as follows, viz. : "I find that there is evidence of a moral marriage between Isaac Snipe and Hannah, slaves. The consent of their owner could confer no right to dissolve such marriage. The relations between Isaac and Patty were not those of husband and wife, but concubinage merely. S. B. W. Riley was illegitimate. There is no proof of the legitimacy of the plaintiffs. I do not consider that the facts of this case bring it within the decision of *Davenport* v. *Caldwell* (10 S. C., 317), nor under the operation of the acts of 1865, 1866, and 1872. It follows, that neither the plaintiffs nor the defendants are heirs at law of S. B. W. Riley, deceased, and that the defendant, Molly Riley, the widow of the intestate, is entitled, under the statute of distributions, to hold the entire estate of her deceased husband, without accountability to the plaintiffs or the defendants," &c. From this decree the Clements, as well as the Snipe branch, appeal to this court.

CLEMENTS' APPEAL.—"1. Because his honor found that 'there was evidence of a moral marriage between Isaac and Hannah, slaves. The consent of their owner could confer no right to dissolve such marriage. The relations between Isaac and Patty were not those of husband and wife, but merely concubinage.' And in error, further, in not finding that Isaac married Patty according to plantation custom, and with the sanction of their owner, and lived with her as his wife until his death, and that the connection between Hannah and Isaac was not a marriage even according to plantation custom, but merely concubinage. 2. Because his honor erred in finding S. B. W. Riley illegitimate, and that there was no proof of the legitimacy of the plaintiffs. 3. Because his honor erred in not finding the plaintiffs the legitimate children and grandchildren of Patty, because the master so found, and neither Molly, the widow (except as to one), nor the Snipe defendants, excepted to such finding, and therefore it must be taken as a fact. 4. Because his honor erred in finding that the facts of this case do not bring it within the decision of *Davenport* v. *Caldwell* (10 S. C.), nor under the operation of the acts

of 1865, 1866, and 1872. 5. Because his honor erred in finding that the plaintiffs are not the heirs at law of S. B. W. Riley, and that Molly Riley, the widow, is entitled to hold the whole estate of her deceased husband, without accountability to the plaintiffs. 6. Because his honor was in error in that he did not find that, irrespective of the fact, whether Hannah or Patty was the wife of Isaac (Riley's father), yet the plaintiffs and Riley, being both children of the same mother, to wit, Patty, that under the operation of section 4 of the act of 1865, they are her legitimate children, and hence inherit the one from the other—the plaintiffs from Riley," &c.

APPEAL OF SNIPE'S CHILDREN.—"1. Because his honor, the judge, found that the consent of the owner of Isaac and Hannah, slaves, conferred no right to dissolve their marriage, and should have found that the act of the owner operated as *vis major*, and therefore dissolved such marriage. 2. Because the judge should have found that the relations between Isaac and Patty, after the dissolution of the marriage between Isaac and Hannah, were those of husband and wife. 3. Because the judge should have found that Stephney B. W. Riley was the legitimate son of his mother, and there being proof of the acknowledgment by his colored father, should have found also that he was the legitimate son of his colored father, Isaac Snipe. 4. Because he should have found that under the operation of the acts of 1865 and 1872, and the decision of *Davenport* v. *Caldwell*, the defendants were the legitimate children of their mother, Hannah, and their heirs, and also (having been acknowledged by their father) the legitimate children of their colored father. 5. Because the judge should have found that the defendants were the half brothers and the descendants of other half brothers and sisters of the intestate, and, as such, were his heirs at law, and entitled to share in his estate, under the statute of distributions," &c.

As we understand it, the case must be determined by the relations which Isaac Snipe bore to the two women, viz., Hannah and Patty. They were all persons of color, and the connections between them originated and ended while they were slaves. It has been truthfully said, that "it was an inflexible rule of the law of African slavery, wherever it existed, that the slave was incap-

able of entering into any contract—not excepting the contract of marriage." From this, it is clear that, while these people were slaves, no connections between them could be considered as legal marriage, in such sense as to become the source of legal heirs at law. If this were all, it is absolutely certain that none of the parties claiming could be held to be the heirs at law of the intestate. But after emancipation had removed the disabilities of slavery, and conferred upon these people the right to acquire property and to make contracts, the anomalous condition of those who were born in slavery was at once apparent, and the legislature, probably feeling that it was in accordance with natural justice that they should be allowed to inherit from each other, passed several acts for the avowed purpose of establishing and regulating "the domestic relations of persons of color," and "to legalize certain marriages," &c.

The act of 1865, amongst other things, provided as follows: "Section 1. The relation of husband and wife among persons of color is established." "Section 4. Every colored child heretofore born is declared to be the legitimate child of its mother, and also of its colored father, if he is acknowedged by such father," &c. The act of 1872 "to legalize certain marriages" provided: "Section 1. That all persons in the State of South Carolina who, previous to their actual emancipation, had undertaken and agreed to occupy the relation to each other of husband and wife, and are cohabiting as such, or in any way recognizing the relation as still existing at the time of the passage of this act, whether the rites of marriage have been celebrated or not, shall be deemed husband and wife, and be entitled to all the rights and privileges and be subject to all the duties and obligations of that relation, in like manner as if they had been duly married according to law. Section 2. And all their children shall be deemed legitimate, whether born before or after the passage of this act; and where the parties have ceased to cohabit before the passage of this act, in consequence of the death of the woman, or from other cause, all the children of the woman recognized by the man to be his, shall be deemed to be legitimate: Provided, however, that no provision of this act shall be deemed

to extend to persons who have agreed to live in concubinage after their emancipation," &c.

These acts, as early as 1877, came under review by this court in the case of *Davenport* v. *Caldwell* (10 S. C., 317), and, after full consideration, it was held that they were not unconstitutional—the syllabus of the decision being as follows: "Where two slaves, persons of color, went through the form of marriage, lived together as husband and wife for a number of years, and died leaving issue before the general emancipation took place; *held,* that under the statutes passed since the Constitution of 1868 was adopted, said persons were to be considered in law as husband and wife, their children as legitimate, and capable of inheriting from each other under the statute of distributions," &c. This case has been recognized and followed in the cases of *State* v. *Whaley,* 10 S. C., 500; *Dingle* v. *Mitchell,* 20 *Id.,* 202; *Myers* v. *Ham, Ibid.,* 522; and *James* v. *Mickey,* 26 *Id.,* 270.

It may be that in some respects the case at bar is not as full and clear as that of Davenport *v.* Caldwell, especially in reference to the alleged marital relations of the parties; yet we are unable to see why the facts do not in most points bring it within the rulings in that case, and under the operation of the acts therein referred to of 1865, 1866, and 1872. The intestate left no lineal descendants. No persons claim an interest in his estate except Molly, who, having gone through the ceremony of marriage with him while they were both slaves, claims the whole of his estate as his widow, and certain other persons, who claim as collateral heirs (half-brothers and sisters of the intestate); so that, unless the acts. referred to have some bearing upon the case, it is perfectly manifest that, while the intestate, Stephney, left property, he left no heirs capable of inheriting it. We think the contention must be mainly decided by the force and effect of the aforesaid acts, wherever the facts authorize their application.

As to the right of Molly, the widow, there is really no contest. It seems that the Rev. Mr. Trapier, of Calvary church, Charleston, performed the marriage ceremony between her and Stephney, the intestate, on December 23, 1853, when they were both slaves. But as they were living together as husband and wife at the time of the passage of the act (1872), the first section of

that act declared them to be husband and wife, and the wife (Molly) is therefore entitled to all the rights and privileges of that relation, "in like manner as if she had been duly married according to law."

As to the Snipe branch of the claimants. They claim as collateral heirs of Stephney, and before they can share in his estate it must appear, not only that they are legitimate, but that Riley was also legitimate; for one born out of lawful wedlock cannot have collateral heirs. The master found that the connection between Isaac and Hannah (father and mother of the Snipes) "was not a marriage even according to the custom of slavery, but an irregular connection, put an end to voluntarily by Isaac himself, with the sanction of the owner, and never revived after his 'taking up' with Patty." The Circuit Judge, however, thought that the circumstances authorized the conclusion that there was a moral marriage between them, and, as we suppose, their issue legitimate. We have read the testimony carefully, and we must say that upon this point we agree with the master, that the relation between Isaac and Hannah was not such as, under the operation of the acts aforesaid, became a legal marriage, making the issue legitimate. Speaking in general terms, the parties happened to be thrown together, and without authority from any one, or the slightest pretence of a marriage contract or ceremony, they lived together for a time, that is to say, until Isaac, who seems to have been "a privileged character," met another woman who was more agreeable to him. We have not been able to discover any proof that there ever was a contract between Isaac and Hannah to live together as man and wife, or, indeed, of any declarations or admissions upon their part, pointing to the existence of any such contract.

We cannot think that it was the intention of any or all of the acts aforesaid to attempt the impracticable thing of legitimizing the whole colored race, without the least regard to the circumstances under which they were born, including the offspring of mere concubinage. As it strikes us, it could not have been the intention to create marriage relations which in fact never existed, so as to affect the rights of inheritance. The law does not undertake to make the marriage contract; that must be the act of the

parties themselves, the law only declaring its consequences. As we understand it, the purpose was to remedy a case where the parties had agreed to occupy towards each other the relation of husband and wife, that is, a moral marriage, lacking only the power of contract to make it legal. The existence of such contract was generally shown by a public ceremony, but that was not indispensable. It might be proved by the declarations or conduct of the parties as evidence from which such contract might be inferred. But, as we think, such conduct or declarations, to be of much force upon that question, should be of such a nature as to point unmistakably to a previous contract of marriage. See the case of *State* v. *Whaley*, *supra*.

But if we take the view of the Circuit Judge, that the circumstances made out a moral marriage between Isaac and Hannah, and their issue legitimate, then, as it seems to us, Isaac having one wife, could not legally marry a second (Patty) while the first was living. If not, the subsequent connection of Isaac with Patty was illicit, and its issue (Stephney) illegitimate, unless the first marriage with Hannah had been dissolved by divorce or death, and we see in the case not the slightest evidence of either. It seems that Hannah outlived both Isaac and Patty, and she was neither sold nor sent off in such way as to make a case, as claimed, of *vis major*, which dissolved her alleged marriage with Isaac. If, as claimed, Isaac and Hannah were husband and wife, and their issue legitimate, then Isaac's subsequent connection with Patty was illicit, and their issue (Stephney) illegitimate. In that case the Snipes, though legitimate, could not inherit from Stephney, an illegitimate, and therefore in any view, the Snipe claim must fail.

Then as to the Clement claim. Assuming, as we have concluded, that Isaac and Hannah were never married, then Isaac could marry Patty. The master found that Isaac and Patty "were married according to plantation custom and with the sanction of their owner, Isaac lived with her as his wife until his death, and that Stephney Riley was their only child, the other children of Patty having been by previous husbands, from whom she was separated by sale and removal," equivalent to a divorce or release *a vinculo matrimonii* (*Davenport* v. *Caldwell*, *supra*). He held

that the plaintiffs (Clements) were the half brothers and sisters of the intestate, Stephney, through their mother, Patty, and as such entitled to one moiety of his estate, the other going to the widow, Molly.    The question is not entirely free from obscurity, but in the exercise of our best judgment we concur in the findings of the master, that Stephney was legitimate, and the Clements, his half brothers and sisters through their mother, Patty. This view is strengthend by the positive declaration in the act of 1865, "that every colored child heretofore born is declared to be the legitimate child of its mother." It may be doubtful who is the father of a child, but there can be no doubt as to who is the mother that gives it birth.    The legislature seems to have considered that, in view of the moral condition of the people, the child should be entitled, at all events, to inherit from and through its mother.

The judgment of this court is, that the judgment of the Circuit Court be modified, and that the cause be remanded, that the conclusions herein announced may be carried out.[1]