**MIAMI BRIDGE COMPANY, a Florida corporation, v. THE MIAMI BEACH RAILWAY COMPANY, a Florida corporation.**

12 So. (2nd) 438                                    January Term, 1943
March 5, 1943                                              En Banc
Rehearing Denied April 6, 1943

*Mitchell D. Price, Zaring & Florence* and *Shutts, Bowen, Simmons, Prevatt & Julian* for petitioner.

*Loftin, Calkins, Anderson & Scott,* for respondent.

BROWN, J.:

The petition for interlocutory certiorari under Rule 34 for the review of a certain order made by the Circuit Court of Dade County in the above entitled cause was denied by this Court, and counsel for the petitioner, the Miami Bridge Company, filed a petition for rehearing which has raised in the minds of a majority of the court some serious doubt of correctness of our former ruling, and the Court decided to reconsider the case on this petition for rehearing and the same was referred to this writer for the preparation of an opinion on the questions involved.

The Miami Beach Railway Company filed a bill against the Miami Bridge Company in which it alleged that it was engaged in the operation of a bus line between Miami and Miami Beach, under franchises granted by both municipalities, via the County Causeway and the 79th Street Causeway; that the Bridge Company was operating a toll road and bridge known as "The Venetian Way" between Miami and Miami Beach, along and over a designated route, over a line of causeways and islands and two bridges, under Chapter

10497, Laws of 1925, which route was located a short distance north of the County Causeway. That the Venetian Way was a shorter and more direct route joining the two cities and that the plaintiff desires to operate its buses and to reach otherwise inaccessible sections of the Beach, but that the Bridge Company not only declined to fix a rate for the buses comparable to those charged by it to other common carriers, but refused to permit the plaintiff to operate its buses over the causeway *at any rate*. The bill prayed that if it be determined that the defendant had the right to make a charge for the use of such road and bridges, then and in that event it be required by mandatory injunction to fix a charge for the use of such road and such bridges by the plaintiff in the operation of its buses fair and reasonable in all the circumstances and not disproportionate to that made by it to others similarly situated, and that it be enjoined and restrained perpetually from charging any toll that would be unreasonable or in excess of that charged others in like circumstances, and that upon the plaintiff's willingness to pay such reasonable charges the defendant be enjoined perpetually from interfering in anywise with plaintiff's use of such roads and bridges and the operation of its buses thereon.

Certain interrogatories were filed by the plaintiff to the defendant, in answer to which the Bridge Company stated it had only one contract with any person, firm and corporation for the operation of jitneys, jitney buses, taxi cabs or other vehicles over the Venetian Way, which contract was made with the Venetian Short Way, Inc., copy of which was attached to its answer. This contract shows that Venetian Short Way, Inc., agreed to pay the Bridge Company $3000.00 as and for tolls for their operation of "for-hire" cars across said Venetian Causeway during the years 1940 and 1941, for as many trips as said cars might make during said years, being "a total of one hundred tag months," the said $3000.00 to be paid at the rate of stated sums per month for each month commencing January 1, 1940 and running through to December 31, 1941, and that should the Venetian Short Way Inc. desire to operate cars in addition to those above set

forth, it could do so at the rate of $25.00 "per tag month" except for "colored cars which shall be $5.00 per month." And the Bridge Company agreed that, unless forced to do so by law, it would not enter into any agreement nor permit any buses or other passenger for-hire cars to operate across their causeway for less than the standard advertised toll rate for buses or passenger cars, except "Florida Year Around Club Aero Cars."

This suit was begun before the expiration of the above contract.

The defendant Bridge Company filed a motion to dismiss the bill upon various grounds, which motion was denied.

The defendant Bridge Company filed an answer and then an amended answer, in which, among other things, it was alleged that the plaintiff had never obtained a franchise to operate between the Cities of Miami and Miami Beach over the Venetian Causeway from either of said cities, nor a franchise to operate over the streets leading to the Venetian Causeway in either of said cities leading to the Venetian Causeway. The answer alleges that the Bay Biscayne Improvement Company constructed said roadway and bridges under a franchise granted by Chapter 10497 of the Acts of 1925, and that it was the owner and holder in fee simple of the right of way, bridges, as well as the franchise rights, and that all the rights, property, franchises, etc., formerly owned and held by the Bay of Biscayne Improvement Company, had since been acquired by the present Company, the Miami Bridge Company. That the Venetian Short Ways, Inc., was the owner of a large number of jitney sedans, and that defendant's contract with that company had reference to that type of transportation, and that the defendant had made no contract with any one for the operation of buses. That the jitney sedans weigh approximately 4000 pounds and carry six or seven persons including the driver. That the buses which the plaintiff wishes to operate weigh approximately 10,000 pounds and will carry between fifty and sixty passengers and when loaded will weigh from three to four times as much as a loaded sedan; that the buses operated by the plaintiff travel at great velocity and by reason of their weight

and velocity of travel would be destructive to the surface of the Venetian Way and dangerous to the draw bridges, of which there are two, and would make the maintenance of the Venetian Way much more expensive. That the plaintiff had never offered to operate buses at the rate fixed by the statute, Chapter 10497, and that the plaintiff by its bill seeks to compel the defendant to enter into a contract, the terms and conditions of which are unknown to the defendant and are not disclosed to the court, and that the court is without jurisdiction to make such a contract between the parties. That the annual expense of maintaining said road and bridges and operating the same amounts to approximately $149,000.00 per year. And that the closing of the Causeway and bridges from too heavy traffic would work irreparable injury to the persons living on the islands and materially interfere with the military training now going on in the City of Miami Beach, the United States Government having been permitted to use the causeway for military purposes and the transportation of passengers and military equipment between the two cities. That the two draw bridges were not constructed to withstand the weight and strain which would result from continued operation of plaintiff's buses thereover except for a short period of time, and would result in such damage to the surface of the Venetian Way as to make necessary frequent repairs, and that such bus operation might result at any time in a break-down of said draw bridges and the cessation of traffic. The defendant was permitted to attach as an exhibit to its amended answer a copy of the report made by Major C. F. Harding, Post Engineer, at the request of the Commanding General of the Engineering Section, based on an examination by him of the two bridges. We quote a few paragraphs from that rather lengthy report as follows:

"Design loads for all of the bridge spans were found to be critical at the bascule sections, the design live load for which was based on two (2) ten ton trucks with 14' wheel base. It was assumed that standard Miami Beach Railway Company's 27-passenger buses with 18' wheel base would be used for transporting troops. These buses are capable of transport-

ing fifty (50) men with hand baggage. Total weight of such a bus, carrying 50 men as outlined above, would be approximately ten tons.

"Although the original design loads allowed for two ten ton vehicles, it is recommended that, due to the age of the bridge spans and bascules, which show moderate deterioration, but one such vehicle be allowed to traverse any given span at a time. This limitation could be easily accomplished by a simple rule of allowing only one-way traffic of such vehicles over the bridge spans and limiting the distance between buses to a minimum of fifty feet, at a maximum speed of 25 miles per hour.

"Under the above limitations and structural repairs as recommended below, the bridge spans may be considered safe for above-mentioned loads."

The last paragraph reads:

"Generally the roadways will bear up under increased traffic of a heavy nature for some time with no repairs necessary, but annual maintenance may be increased about fifty per cent. The Miami Bridge Company has no equipment or material on hand for roadway maintenance and is unable to obtain any due to priorities. In the past years all repair work has been handled for them by the Belcher Oil Company. The roadways, except on Belle Isle, received an oil surfacing in 1939 costing $30,000.00. This will be necessary again in about two years if subjected to usage by heavy vehicles. It is estimated that normal maintenance requires about 25 yards of sand asphalt paving, but this does not cover repairs due to settlement, etc."

On October 2, 1942, the plaintiff moved the court for a decree on the bill of complaint and amended answer "on the ground that the amended answer is insufficient as a defense." On this motion the chancellor on November 12, 1942, entered a decree holding that the amended answer was insufficient as a defense insofar as the right of the plaintiff to operate its buses across the causeway of the defendant, upon the payment of reasonable compensation, was concerned, and that said answer, being not further amendable, the court ordered

that said motion be granted, and that a decree be entered for the plaintiff as follows:

"That the Venetian Causeway owned and operated by the defendant between the cities of Miami and Miami Beach in Dade County, Florida, is a public toll bridge and the plaintiff has a legal right to operate its buses thereupon, without discrimination against it by the defendant, or in favor of other operators of for-hire vehicles, upon the payment by it to the defendant of reasonable compensation therefor.

"That the plaintiff is hereby authorized and empowered to operate its buses (not heavier than those heretofore operated by it over the Venetian Causeway for the transportation of men and supplies for the United States Army) over the causeway upon the payment of reasonable compensation therefor, and until such time as the determination of what constitutes reasonable compensation can be made herein, then upon compliance with the following terms and conditions:

"(a) The payment monthly by the plaintiff to the defendant of an amount twice that being paid by Venetian Shortway, Inc., a Florida corporation, on the date of the filing of the bill herein, for the operation of its vehicles over the causeway.

"(b) The filing of a good and sufficient surety bond (to be approved by the Court) payable to the defendant, in the amount of $25,000. conditioned to pay any further sums which may be found to be reasonable compensation for the use of such causeway pending its determination by the Court and any sums for substantial and unusual damage or injury to the structure of the causeway (other than usual and ordinary wear and tear) which may have been caused during such time by the operation of the plaintiff's buses thereon.

"3. That upon compliance by the plaintiff with such terms and conditions or upon the payment by the plaintiff of reasonable compensation when this has been determined herein, the defendant, its officers, agents and employees be, and they are hereby enjoined and restrained from interfering in anywise with the operation by the plaintiff of its buses over the causeway.

"4. That F. M. Hudson, Esq., a practicing attorney of this court, be and he is hereby appointed Special Master herein, and directed to take such testimony and evidence as the parties shall produce upon the following questions, to wit:

"(a) What constitutes reasonable compensation for the use by the plaintiff of the causeway for the operation of its buses;

"(b) Whether or not, as a matter of fact, the operation of the plaintiff's buses over the causeway is substantially and unusually injurious (other than usual and ordinary wear and tear) to the structure thereof;" and report his findings to this Court with all speed and dispatch.

"5. That upon the filing of the report by the Special Master, the Court shall determine what constitutes reasonable compensation for the operation of the buses of the plaintiff over the causeway and if the amount of such reasonable compensation is more or less than the amount paid by the plaintiff to the defendant pending such determination, then the party entitled to such difference shall be reimbursed by the other. This order shall take effect on November 20, A. D. 1942."

It will be seen from a reading of the above order that it does not constitute a complete final decree, as it leaves open for further determination by the court what would constitute a reasonable rate for the operation by the plaintiff of its buses over the defendant's causeway, and whether or not the operation of such buses over defendant's causeway would be substantially and unusually injurious to the structure thereof (other than ordinary wear and tear) and appointed a special master to take testimony and report his finding on these two questions. So, our conclusion is that this decree or order was, in large part at least, an interlocutory order or decree and that the same is subject to review by this Court under our Rule 34.

It will be noted that the chancellor by this order adjudged that the plaintiff below had the right to operate its buses over defendant's causeway and bridges upon the payment of a reasonable compensation, and left open for future determination, upon evidence to be submitted by the parties, the

question of what would be a reasonable compensation, but did not expressly state that after determining that question the court would fix a particular rate and compel the defendant by mandatory injunction to allow the defendant to operate its buses at the rate so fixed. While this might be implied, we cannot say positively from this order that the court clearly intended to fix the rate of a public utility and compel it to operate at that particular rate. There is a serious question as to whether the court would have that power. However, under the circumstances of this case the court might have the authority, if justified by the testimony yet to be taken, to set aside as unreasonable the rate fixed by the franchise statute, Chapter 10497, and determine that any rate in excess of what the court finds to be a reasonable one could not lawfully be imposed by the defendant upon the plaintiff, thus leaving the parties free to enter into an agreement for the charging of the rate found by the court to be reasonable, or any less rate that they might agree upon.

However, the court did grant a temporary mandatory injunction authorizing plaintiff to operate its buses over defendant's causeway and bridges until the court could determine what constituted a reasonable compensation, upon the payment monthly by the plaintiff to the defendant of an amount "twice that being paid by the Venetian Shortway, Inc., a Florida corporation, on the date of the filing of the bill herein for the operation of its vehicles over the causeway." We think this part of the court's order is erroneous. The presumption is that the legislative rate is a reasonable rate until after full hearing on pleadings and evidence the court determines otherwise. The Legislature, in said Chapter 10,497, the defendant's franchise act, had provided that defendant might charge a toll not exceeding fifty cents per bus, including driver, and five cents for each passenger. This provision of the Act should have been left in full force and effect until the evidence for both sides had been taken and the court's findings on the evidence had been arrived at.

The defendant in the court below, respondent here, contends that this was a permanent mandatory injunction and not a mere temporary one. To this contention we cannot

agree. We think it evident from the chancellor's order as a whole that he did not intend to grant a permanent mandatory injunction unless and until he was satisfied by the evidence to be submitted before a master as to what would constitute a reasonable rate and whether or not the operation of these buses would be substantially dangerous to the surface of the highway or the structure of the bridges.

We have held in several cases that mandatory injunctions are rarely granted before final hearing, or before the parties have full opportunity to present all the facts in such manner as will enable the court to see and adjudge what the truth may be. However, there are cases holding that relief by way of mandatory injunction may be granted on a proper showing made. In F.E.C. Ry. Co. v. Taylor, et al., 56 Fla. 788, 47 So. 345, this Court said:

"It is settled by an overwhelming weight of authority that, except in rare cases where the right is clear and free from reasonable doubt, a mandatory injunction, commanding the defendant to do some positive act, will not be ordered *except upon final hearing,* and then only to execute the judgment or decree of the court. Hunt v. Sain, 181 Ill. 372, 54 N.E. Rep. 970.

"In Mocanaqua Coal Co. v. Northern Central Ry. Co., 4 Brewst, (Pa) 158, it is held that: 'A mandatory injunction, as a general rule can only be properly granted on final hearing as its effect before that time is like awarding an execution before trial and judgment.' To the same effect are the following cases:" (Citing a vast number of authorities.)

See also Zetrouer v. Zetrouer, 89 Fla. 253, 103 So. 625; Stephens v. Stephens, 87 Fla. 466, 100 So. 746; Trust Co. of Fla. v. Crider, 102 Fla. 593, 136 So. 434, and Section 73 of the 1931 Chancery Act.

In this connection it must be remembered that the bill in this case did not allege what would be a reasonable rate, nor did it allege any facts and circumstances upon which the court could say with reasonable certainty what would be a reasonable rate, and our view is that the answer of the defendant below, as well as to answers to the interrogatories, do not of themselves give sufficient data upon which to

establish a reasonable rate. The bill does not expressly pray *the court* to itself fix a reasonable rate but prays that the defendant be required to fix a charge for the use of such roads and bridges by the plaintiff in the operation of its buses thereon, fair and reasonable in all the circumstances and not disproportionate to that made by it to others similarly situated, and that the defendant be enjoined perpetually from charging any toll that is unreasonable or in excess of that charged others in like circumstances, and that upon the plaintiff's willingness to pay such reasonable charges the defendant be enjoined perpetually from interfering with plaintiff in the operation of its buses over defendant's road and bridges, so the injunction as granted does not follow the prayer of the bill and must have been intended as merely temporary in its nature.

There is some difference of opinion among counsel as to the effect of setting the case down for a decree on bill and answer and also as to whether or not the court could consider the interrogatories to the defendant and its answers thereto in connection with the decision of the question as to whether the plaintiff was entitled to a decree on bill and answer. Many of our old cases on that subject have been made inapplicable by Section 40 of the 1931 Chancery Act. This Section, together with the committee's note thereon, reads as follows:

"Section 40. *Motion for decree on bill and answer.*—The plaintiff may, within ten days after the filing of the answer, or within such further time as the court may allow, move for a decree on bill and answer, and if the motion be overruled the plaintiff shall have the right to proceed to trial notwithstanding the motion or order thereon; and if the answer be found insufficient as a defense but amendable, the court may permit it to be amended on such terms and conditions as may be equitable."

"*Committee Note:* The foregoing section follows the code practice of a motion for a judgment on the pleadings, combined with the chancery practice of hearing on bill and answer. It is very probable that the same practice can be followed under the existing federal equity rules, but the fore-

going is proposed merely to clarify the practice and prevent unnecessary doubts."

"The Section is designed to have substantially the same effect in equity practice as Section 2640 R.G.S. (4306 C.G.L.) with reference to demurrers at law."

Following the above quotation, there appears such a valuable note by Mr. Edward McCarthy in his book, "Florida Chancery Act Annotated," that we thing it advisable to quote here a part of what he has to say, because we fully agree with him and it may be of considerable assistance to the bench and bar in future cases:

"As suggested in the committee's note, this section is intended to follow the code practice of motion for judgment on the pleadings, and to have the effect of a demurrer at law. Foster v. Esch, 113 Fla. 377, 152 So. 444, citing this annotation.

"It cannot be considered as the exact equivalent of the hearing on bill and answer under the old chancery practice. The old answer in chancery was more than a pleading which stated the defendant's defense; it was also an examination of the defendant, by which the plaintiff proved the allegations of his bill. The purpose of the hearing was first to see whether the examination of the defendant had produced sufficient admissions to prove the equity of the bill. If there were not sufficient admissions in the answer to prove the equity of the bill, the bill was dismissed, regardless of whether the answer otherwise stated a defense; and if there were sufficient admissions to prove the equity of the bill, the plaintiff was entitled to a decree, unless the answer stated a good defense in avoidance. On such a hearing the answer was taken as true on all its points. See Goodwin v. Phifer, 51 Fla. 441, 41 So. 597. And this is true whether or not the averments of the answer are 'responsive.' Seaboard Oil Co. v. Donovan, 99 Fla. 1296, 128 So. 821. Compare Whittaker v. Eddy, 109 Fla. 535, 147 So. 868. In order to have under this act what would be the equivalent of the old hearing on bill and answer, it would be necessary to hear the cause on the bill, the answer to the bill, and the answers to the interrogatories under Section 48; but this act makes no

provision for such a hearing. See Amer. Vot. Mach. Corp. v. New York (D.C.N.Y.), 2 F. Supp. 191. Compare Bronk v. Chas. H. Scott Co. (C.C.A. 7), 211 Fed. 338, where the court sustained a motion to dismiss the bill on the ground that the plaintiff's answers to the defendant's interrogatories disproved the plaintiff's cause of action. See other cases upon this point in annotation following Section 33. And see annotation under Section 48 relating to interrogatories. The important differences between a hearing under Section 40 (supra) and the former hearing on bill and answer are two, namely, (1) that under this act the averments of the bill, with certain exceptions, are deemed to be true unless sufficiently denied in the answer, and (2) a decision for the plaintiff or defendant, as the case may be, does not necessarily result in the immediate entry of final decree, but if the motion be overruled the plaintiff may proceed to trial, and if it be sustained the defendant may amend his answer upon terms. The motion would be properly sustained wherever the answer fails to deny the material allegations of the bill and fails to set up a defense in avoidance. See Felch v. Ceaudry, 40 Cal. 439; Doll v. Good, 38 Cal. 287. But the motion obviously could not be sustained where the answer sufficiently denies essential allegations of the bill or states a defense in avoidance."

Now in this case, a fair consideration of the bill and answer leads us to the same conclusion reached by the chancellor and that is that on such bill and answer, it could not be determined, without the taking of testimony, what would be a reasonable rate, and whether or not the operation of plaintiff's busses would be so substantially dangerous to the surface and structure of the road and bridges as to preclude the court from requiring the defendant to permit their use thereover. We think that the chancellor was fully justified in his conclusion that the causeway and bridges belonging to the defendant below constituted a public utility, and that unless the operation of plaintiff's busses were substantially dangerous to the road and bridges, the plaintiff was entitled to be allowed to use the same for the operation of its buses between Miami and Miami Beach upon payment

of a reasonable charge or rate, even though this required the striking down of the rate provision in the statute.

The Act of 1925, hereinabove referred to, which constitutes the franchise under which the defendant Bridge Company was and is operating, contained a schedule of maximum rates. The statute provided that the tolls "shall not exceed the following schedule:" and in this schedule the following, among other things, appears: "any other buses, taxis, or jitneys and driver, fifty cents; for each additional horse or person, five cents." This brings us to a consideration of an important question.

Except insofar as such matters may have been regulated by duly constituted public authority, a utility has the right to prescribe rules, regulations and rates for the conduct of its business, provided the same are reasonable, just, non-discriminating, and not contrary to law. It has long since been found necessary that some public control over the rates of public utilities should be established in order to fix charges and reasonable rates of compensation for the services rendered by such utilities. This power of regulation can be exercised either directly by the Legislature or through the instrumentality of boards and commissions created by the Legislature, or created by organic law. The Florida Constitution of 1885 provides, Art. XVI, Section 30, that: "The Legislature is invested with full power to pass laws for the correction of abuses and to prevent unjust discrimination and excessive charges by persons and corporations engaged as common carriers in transporting persons and property or performing other services of a public nature; and shall provide for enforcing such laws by adequate penalties or forfeitures."

There is a well recognized distinction between the judicial and legislative power over rates. The courts deal with the existing rates. Their power is confined to the determination of whether a given rate is a reasonable rate, and the rate made by the Legislature or a commission set up by the Legislature may be set aside by the courts if such rate is found to be an unreasonable rate. On the other hand, the Legislature is vested with full power either to prescribe directly the rates

of public utilities, or to set up administrative bodies, like the Railroad Commission and other boards and commissions, to make and establish such rates and charges as they may determine to be reasonable, which rates shall be binding for the future. So the power to make rates is legislative rather than judicial. Interstate Commerce Commission v. C.N.O. & T. P. Ry. Co. 167 U. S. 479, 17 S.C. 896, 42 L.Ed. 243; Terminal R.R. Asso'n. v. U.S., 266 U.S. 17 69 L. Ed. 150; C.B. & Q.R.R. Co. v. Iowa, 94 U.S. 155, 24 L. Ed. 94; Minn. Rate Cases, 230 U.S. 352, 57 L. Ed. 1511, 33 S.C. 79. See also 51 C.J. 11-12-30; 9 Am. Jur. 467-468. Thus the Legislature, either directly or through a duly constituted administrative body, can make the rates to be charged by public utilities, but the courts have the power to strike down any rate or rates which are clearly proven to be unreasonable and unjust, either to the utilities themselves or to the public which they serve.

However, an exception to this rule has been recognized in this State in the case of State ex rel. Young v. Duval County, 76 Fla. 180, 79 So. 692, known as the Jacksonville Bridge Company case. In that case the court upheld the constitutional validity of a provision in a legislative act that whenever the County Commissioners of Duval County shall fix any toll or charges for a county bridge erected under the said act, such tolls and charges shall be reasonable, and are to be reviewed by one of the Circuit Judges of Duval County, who, after a hearing should enter an order approving such tolls or charges, in whole or in part, or increase or decrease the same, as he shall determine from the evidence as fair and reasonable. This Court held that this provision did not violate Art. II, and Section 1 of Art. III, providing for the separation of the powers of government, because Florida, unlike many other states, had an organic provision, Sec. 2 of Art V to the effect that the circuit courts shall have jurisdiction of certain expressly stated subjects, "and of such other matters as the Legislature may prescribe."

So inasmuch as the Legislature did prescribe that the Circuit Judges of Duval County should review the action of the Board of County Commissioners in fixing rates charged

for the use of the Jacksonville bridge, and either approve or disapprove or lower or raise them, this court, in a very carefully considered opinion, held that the Legislature had the power under said Section 2 of Art. V, to give the Judges of the Circuit Court of Duval County this power and jurisdiction over the bridge rates fixed by the County Commissioners of that County. In the opinion in that case, the Court held that the legislative authority to make rates, rules and regulations for public utilities was a power that might be delegated by the Legislature to appropriate administrative tribunals. The Court in that case recognized the general rule that courts may not, without the sanction of some provision of organic law, prescribe rates for public service corporations.

This is the only case that the writer recalls in which this Court has held that a circuit court or circuit judges have the power to establish rates to be charged by public utilities, and in that case this power was conferred upon the Judges of the Circuit Court of Duval County by a legislative act which was held valid under Sec. 2 of Art. V Const. of 1885.

The Legislature has not conferred any rate making power on the Circuit Court of the 11th Judicial Circuit or its Judges, and we know of no authority which would justify said circuit court to make any particular rate or rates to be charged by any public utility. But we do hold that the said circuit court has jurisdiction, if the evidence to be taken justifies it, to hold the maximum rate established by the Legislature for the passage of buses over the defendant's causeway and bridges to be unreasonable, and to set it aside, under the well settled judicial power to set aside and hold as invalid any unjust, unreasonable and discriminatory rate or rates, made either by the Legislature directly or by any administrative body authorized by the Legislature to act in that regard, and to enjoin the enforcement of such unreasonable rate or rates. If the courts do not have this power, public utilities could invade the constitutional rights of the public and of individual members of the public, which fundamental rights are protected by the Bill of Rights of our Florida Constitution. Under the circumstances of this case, we think the chancellor does have the power to strike down the legislative

made rate in this case if the evidence yet to be taken shows it to be clearly excessive, unreasonable and unjust; but we also hold that the chancellor might go a step farther and indicate a maximum reasonable rate which if exceeded by the public utility the court would likewise hold unreasonable and invalid, and enjoin its enforcement. It would then be the duty of this public utility to make a rate for the passage of buses over its causeway and bridges which would not be unreasonable in the light of the court's decision. And if the utility should not promptly make such a rate, it could be compelled to do so, either by a mandatory injunction or by mandamus. Of course, in this matter of the reasonableness or unreasonableness of rates, many factors must be considered, including the rights of a public utility to reasonable compensation for its services and the equal protection of the laws. See City of Gainesville v. Gainesville G. & E. Power Co., 65 Fla. 404, 62 So. 919.

Counsel for the respondent here, plaintiff in the court below, must have had in mind the principles which we have above outlined by reason of the language used in the prayer of the bill of complaint.

There is no direct allegation in the bill that the plaintiff bus company has any municipal franchise or authority to operate its buses over the streets leading to the causeway or over the causeway itself, and the answer alleges that it has never obtained such authority. Petitioner contends that this makes the bill fatally defective, and that the court below has attempted to confer an authority which the two cities alone can confer, and which their charters give them authority to confer. It is well settled that, as a general rule, a public service company cannot use the streets of a city unless the municipality consents, or unless it has legislative authority to do so. So the contention of the petitioner here that the court below should have decided the case in favor of the bridge company on this issue alone, while untenable, is plausible. The following cases are cited by petitioner to support this contention:—Memphis St. Ry. Co. v. Rapid Transit Co., (Tenn.) 179 S.W. 655; Green v. Ivey, 45 Fla. 338, 33 So. 711; Ferry Pass, etc., Asso'n. v. Whites River, etc., Asso'n., 57

Fla. 399, 48 So. 643 and Brown v. Fla. Chautauqua Asso'n., 59 Fla. 447, 52 So. 802. The first case cited involved an effort by a street car company to enjoin the operation by the defendant of jitneys on the city's streets, in competition with the street cars, without having obtained a franchise so to do. This was a case of unlawful competition which injured the complainant. In the second cited case this Court held that where a person is lawfully licensed to operate a ferry over a river, he has the right to enjoin another not so licensed from operating a ferry at or near to his licensed ferry as to infringe upon his ferry rights. This was a case of infringement by an unlicensed competitor upon the franchise rights of the plaintiff. The third cited case involved the infringement by the defendant upon the riparian rights of the plaintiff, and the fourth case involved injury to the plaintiff arising from an unlawful obstruction of a public highway. As we view it, none of these cases are in point here. We are dealing with a public service corporation owning and operating a toll road and bridges. We do not think the public utility can raise the question of whether or not the bus company has obtained the consent of the adjacent cities to operate buses over the streets leading to the causeway or over the causeway. If they cannot so operate without the authority of the respective cities, the cities have the power to enjoin them.

For the reasons above stated our previous order denying the petition for certiorari in this case is hereby vacated, and our order now is that the order and decree of the court below, hereinabove referred to, dated November 12, 1942, be and the same is hereby quashed, and the cause remanded for further proceedings not inconsistent with the foregoing opinion.

In view of the fact that the present opinion and order of this court is in effect substituted for its previous order of January 8th, 1943, it may well be treated as an original decision insofar as the rights of the parties to file petitions for rehearing within the usual time is concerned.

BUFORD, C. J., TERRELL and ADAMS, JJ., concur.

CHAPMAN and THOMAS, JJ., dissent.

SEBRING, J., not participating.