SHARP, Judge.
Rosalind Holding Company appeals from a final judgment denying it any relief in its class action suit[1] against the Orlando Utilities Commission and the City of Orlando. The lower court held that Rosalind failed to prove the utility rates charged by the OUC for the years 1970 through 1978 were unreasonable and confiscatory. The court assessed Rosalind with taxable costs of $8,624.67, which Rosalind also appeals. After an extensive review of the record in this case, we affirm the lower court on both grounds.
The OUC was created in 1923 by a special act of the legislature, Chapter 9861, Laws of Florida (1923), as a part of the City of Orlando. Its purpose is to operate and manage the City’s electrical and water utilities both inside and outside the boundaries of the City.[2] The Commission is empowered to set the utility rates, and the City is required to pay for any OUC utilities it uses. During the period 1970 through June 1974, Florida excluded municipally owned utilities from regulation by the Florida Public Service Commission (PSC).[3] Effective July 1, 1974, section 366.04(2), Florida Statutes, was added to give the PSC power over municipal electric utilities... “(b) [t]o prescribe a rate structure for all electric utilities ... and (f) [t]o prescribe and require the filing of periodic reports and other data as may be reasonably available and as necessary to exercise its jurisdiction.” Since 1978 the OUC has filed its reports with the PSC, but as yet no regulations concerning rate structure have been promulgated by the PSC.
In contrast to a public service commission, which is designed to regulate and set reasonable rates for utilities and require certain methods of calculating reasonable rates, the courts have a much more limited function. Setting rates and methods to calculate them is a legislative function, whether it is done by a public service *1211 commission or the OUC board.[4] A person seeking to attack in the courts the rates charged by a utility has the burden of showing[5] that the rates are outside or beyond the “zone of reasonableness,”[6] as established by the evidence, and not necessarily by the PSC, so as to be confiscatory or discriminatory.[7] Absent a controlling statute, a municipal utility, like any other utility, is entitled to earn a reasonable rate of return on its capital[8] and its rates may be set so that it earns a rate of return on its equity comparable to other similar businesses.[9]
Rosalind argued that certain payments made by the OUC to Orange County “in lieu of taxes” and payments in the nature of franchise fees paid by the OUC to the City of Orlando were improper operating expenses, and if disallowed as operating expenses, the results would substantially increase the OUC’s income, and therefore its rate of return on capital, far above what other municipal utilities and private utilities are allowed to earn. Rosalind also argued that the OUC should not have been allowed to set its rates so as to earn as high a return on its equity as an investor-owned utility. The OUC argues that these matters relate to the method of calculating rates and not to the reasonableness of the rates themselves. Obviously the method of calculating rates impacts on their reasonableness, and it is a proper subject for judicial review.[10] We shall consider each point raised by Rosalind separately.
I. “IN LIEU OF TAX” PAYMENTS MADE BY ORLANDO UTILITIES COMMISSION TO ORANGE COUNTY.
The record established that the OUC made payments totaling approximately $1,114,000 to Orange County from 1973 through 1978. The amount of each annual payment was based on 1% of the retail sales of electricity to the OUC’s customers outside the City of Orlando, but within Orange County. Witnesses for the OUC testified *1212 that these payments were somewhat less than a private utility would have paid Orange County for ad valorem taxes based on the value of OUC's property located within Orange County, and that the payments were for police and fire protection and other services afforded the utility by the County-
Rosalind argued that the City’s property could not legally be taxed by the County absent a general statute,[11] which does not now exist, that the amount paid to Orange County was not a valid obligation of the OUC, but rather was a “gift”, and therefore it should not serve to reduce the OUC’s income by allowing the utility to treat it as an operating expense.
Expert witnesses for the OUC testified that it was not an uncommon practice in other states for tax exempt utilities to make “tax-equivalent” payments to local governmental bodies providing them with valuable services. Failure to make such payments would have the effect of discriminating against the county taxpayers because they presumably would have to pay through higher taxes for the free services received by the utility.
We have found no controlling precedent in Florida on this point. In some jurisdictions, such payments are not allowed.[12] However, the PSC has approved the payment of “reasonable” charitable contributions by regulated utilities and the inclusion of these amounts in operating expenses of the utility for purposes of calculating reasonable rates.[13] The allowance or disallowance of such “in lieu of tax” payments as operating expenses for purposes of determining the rate structure or rate base of a utility is a matter more appropriate for determination by the PSC than the courts[14] where the payments (as in this case) are reasonable in amount for the purpose intended, are actually made, and are made pursuant to a reasonable ground or basis.[15]
We conclude that Rosalind failed to establish that the OUC’s inclusion of the “in lieu of tax” payments to Orange County as an operating expense was arbitrary or unreasonable.[16]
II. “FRANCHISE” PAYMENTS MADE BY OUC TO THE CITY OF ORLANDO.
The record showed that since 1970, the OUC has been paying to the City of Orlando substantial annual payments[17] labeled “franchise-equivalent” fee. The OUC pays the franchise fee to Orlando in addition to profits earned by the OUC.[18] For example, in 1973, $1,442,561 was paid to the City of Orlando as a franchise fee and the OUC also paid the City $5,542,000 in profits. The OUC keeps as retained earnings about as much as it pays Orlando in profits.
The OUC shows the franchise fee as an operating expense, which reduces its net operating income. However, there is no franchise agreement between the City and the OUC. Further, the OUC witnesses ad *1213 mitted that the franchise fee was treated as additional income on the OUC’s reports filed with the Federal Power Commission and on its official bond statements, and that these funds would be available to pay bonds or other “real” operating expenses if needed.
Rosalind argues that the OUC’s treatment of the franchise fee as an operating expense is an improper method to mask additional profits. Since the OUC is in actuality part of the City of Orlando, no payment to a third party is possible. It is merely a transfer of funds from one pocket to another. We agree that the franchise fee should be considered as additional OUC profit. See City of Logansport v. Public Serv. Comm’n of Ind., 202 Ind. 523, 177 N.E. 249, 76 A.L.R. 838 (1931).
However, assuming the franchise fee constitutes additional profits to the OUC, and should in fact be treated as such, this does not, by itself, establish that the OUC’s rates are unreasonable. Municipal utilities in Florida are entitled to earn a profit on their utilities operations, and some municipalities in Florida take a higher percentage of the utility’s profit into general revenues than Orlando does, even including the franchise-equivalent payment.[19]
No witness testified that the OUC was earning an excessive amount of profit on its operations. Further, the one expert witness for Rosalind was not allowed to testify that the OUC’s rates were unreasonably high, and he admitted he was not qualified to so testify. The OUC’s expert witnesses all testified the OUC’s rates were reasonable. We conclude that Rosalind failed to establish by a preponderance of the evidence that the OUC was earning an excessive profit, or that its rates were unreasonably high for the years in issue. See Killion v. City of Paris, 192 Tenn. 446, 241 S.W.2d 524 (1951).
III. WAS THE 13.5% RATE OF RETURN ON EQUITY USED BY ORLANDO UTILITIES COMMISSION IN SETTING ITS RATES SHOWN TO BE UNREASONABLE AND ARBITRARY?
The record showed that the OUC used the rate of 13.5% in calculating the needed rate of return on equity in setting its rates for the years in question. The testimony established that the rate of return among investor-owned Florida utilities from 1972 to 1977 ranged from 12.75% to 16.35%, and that the PSC had established from 13% to 15% as a “reasonable” zone. Both appellant and appellees agree that a utility should be allowed to earn a reasonable rate of return on its equity,[20] but they disagree what industry earnings standard should be applied.
Rosalind argued that because the OUC is a city-owned utility, the court should not consider the rate of return on equity allowed to privately owned utilities. Some states’ public service commissions do not allow municipal utilities to receive as high a rate of return as a private utility[21] because they pay no taxes, are able to raise funds through bonds at lower interest rates, and their “stockholders,” or cities who take their profits, pay no taxes either. Rosalind showed that the average rate of return on equity for municipal utilities, as shown in a 1973 Federal Power Commission Report,[22] was only 8.1%. The expert witness for Rosalind also testified that a municipal utility should not earn a rate of return on equity higher than 6% to 9%, and that OUC’s calculations based on 13.5 would make its rates unreasonable.
*1214 However, experts for the OUC testified that the OUC’s operations are more comparable to the private utilities in Florida because of its size and the fact that it has a substantial generating capacity. The municipal utilities in the Federal Power Commission’s Report were considerably smaller than the OUC and many had no generative capacity. At least one public service commission allowed a city utility a rate of return on equity comparable to private industry,[23] and the courts in our jurisdiction frequently equate municipal utilities with privately owned utilities.[24] Where there is conflicting expert testimony concerning the proper rate of return on equity standard to be applied to municipal utilities, we cannot say the lower court erred in finding for the OUC on this point.[25] We note however, that this is precisely the type of ruling relating to rate structure that the PSC should determine.[26]
Rosalind’s expert witness testified that if the Orlando franchise fee was treated as profit as we conclude it should be, then the OUC was earning approximately a 16% rate of return on equity rather than 13.5%. The OUC’s witnesses conceded that disallowance of such a large “operating expense” would indeed affect the OUC’s income yield perhaps as much as 2%. Assuming the OUC is really setting its rates to earn 16% rate of return on equity, this figure exceeds the PSC’s range of reasonableness, or certainly sits on the extremely high side of the range.[27] However, rates may be higher than the PSC’s “reasonable” range but still not be confiscatory and arbitrary.[28] Although this is a close question, we are reluctant to rule that one percentage point topples the OUC into the confiscatory or excessive range.[29]
IV. COSTS.
Finally Rosalind argues that litigation costs[30] should not be taxed against it as the representative of the class action because such amount has been included in the rates as an operating expense and therefore has been assessed to the OUC’s consumers through regular bills for service. We find this argument to be without merit, and consequently affirm the award of costs to the OUC as the prevailing party.[31]
AFFIRMED.
ORFINGER, J., and WALKER, GRIS-SIM H., Associate Judge, concur.

.In the Orlando Utilities Commission v. Rosalind Holding, 330 So.2d 56 (Fla. 4th DCA 1976), the Fourth District Court ruled that the complaint alleging that the Orlando Utilities Commission had charged its customers unreasonable rates, filed by Rosalind as a member of the class, stated a cause of action. Rosalind is a “resident” of the City of Orlando and an OUC customer. The OUC has approximately 80,000 consumers of its utilities services. The standing of Rosalind to bring this suit, and the propriety of the suit as a class action, were determined in the prior appeal and are therefore the “law of the case.”

. Ch. 10968, Laws of Fla. (1925).

. Edris v. Sebring Util. Comm’n, 237 So.2d 585 (Fla. 2d DCA), cert. denied, 240 So.2d 643 (Fla. 1970); §§ 366.02, 366.11, 367.022, Fla.Stat. (1979).

. Cooper v. Tampa Elec. Co., 154 Fla. 410, 17 So.2d 785 (1944); City of Pompano Beach v. Oltman, 389 So.2d 283 (Fla. 4th DCA 1980); and 64 Am.Jur.2d, Public Utilities §§ 80, 89 (1972).

. Mohme v. City of Cocoa, 328 So.2d 422 (Fla.1976); Miami Bridge Co. v. Miami Beach Ry. Co., 152 Fla. 458, 12 So.2d 438 (1943); 12 E. McQuillin, Municipal Corporations, § 35.37a (1970).

. Federal Power Comm’n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); Cooksey v. Utilities Comm’n, 261 So.2d 129 (Fla.1972); Pinellas Apartment Ass’n., Inc. v. City of St. Petersburg, 294 So.2d 676 (Fla. 2d DCA 1974); § 180.13(2), Fla.Stat. (1979); 64 Am.Jur.2d Public Utilities §§ 135, 190 (1972); Annot., 127 A.L.R. 94 (1940).

. Miami Bridge Co. v. Miami Beach Ry. Co., 152 Fla. 458, 12 So.2d 438 (1943); City of Pompano Beach v. Oltman, 389 So.2d 283 (Fla. 4th DCA 1980); Clay Util. Co. v. City of Jacksonville, 227 So.2d 516 (Fla. 1st DCA 1969); see Edris v. Sebring Util. Comm’n, 237 So.2d 585 (Fla. 2d DCA), cert. denied, 240 So.2d 643 (Fla.1970); Wichita Gas Co. v. Public Serv. Comm’n of Kan., 2 F.Supp. 792 (D.Kan.1933), modified, 290 U.S. 561, 54 S.Ct. 321, 78 L.Ed. 500 (1934); 64 Am.Jur.2d Public Utilities § 86 (1972); 29 C.J.S. Electricity § 33 (1965).

. The parties all agree that basing rates on “cost of capital” is the most universally adopted and reasonable method in the industry. The OUC has employed this method in setting its rates.

. Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); City of Logansport v. Public Serv. Comm’n of Ind., 202 Ind. 523, 177 N.E. 249, 76 A.L.R. 838 (1931).

. In re Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (reviewed method of regulation); Banton v. Belt Line R. Corp., 268 U.S. 413, 45 S.Ct. 534, 69 L.Ed. 1020 (1925) (reviewing operating expenses); Wichita Gas Co. v. Public Serv. Comm’n of Kan., 2 F.Supp. 792 (D.Kan.1933), modified, 290 U.S. 561, 54 S.Ct. 321, 78 L.Ed. 500 (1934) (reviewed proper operating expenses and fair rate of return on utility property); Shevin v. Yarborough, 274 So.2d 505 (Fla.1973) (reviewed method to calculate rate base, inclusion of items in operating expenses); City of Miami v. Florida Public Serv. Comm’n, 208 So.2d 249 (Fla.1968) (reviewed method to compute rate of return); Hawaiian Elec. Co., Inc., 56 Haw. 260, 535 P.3d 1102, 83 A.L.R.3d 951 (1975) (reviewed “promotional” expenses as operating expenses); State v. Department of Pub. Serv., 19 Wash.2d 200, 142 P.2d 498 (1943) (reviewed operating expenses).

. Art. VII, § 3(a), Fla.Const.

. State v. Department of Pub. Serv., 19 Wash.2d 200, 142 P.2d 498 (1943).

. City of Miami v. Florida Pub. Serv. Comm’n, 208 So.2d 249 (Fla.1968). See also In re Petitions of Burlington Elec. Light Dep’t, 135 Vt. 114, 373 A.2d 514 (1977); 56 Am.Jur.2d Municipal Corporation § 583 (1971).

. See Occidental Chem. Co. v. Mayo, 351 So.2d 336 (Fla.1977).

. In re Petitions of Burlington Elec. Light Dep’t, 135 Vt. 114, 373 A.2d 514 (1977).

. Shevin v. Yarborough, 274 So.2d 505 (Fla.1973); Columbus & S. Ohio Elec. Co. v. Public Util. Comm’n of Ohio, 58 Ohio St.2d 120, 388 N.E.2d 1378 (1979).

. Approximately $2 million per year.

. The amount of the fee is based roughly on 6% of the revenues earned in Orlando. Six percent for a true franchise fee is fairly standard in Florida. Florida League of Cities, Municipal Utilities in Florida 122, 123 (1974). We note that the PSC now required real franchise fees to be paid only by the consumers in the cities charging the fees. City of St. Petersburg v. Hawkins, 366 So.2d 429 (Fla.1978). However, this is an area of discretion available to the PSC. In any event we do not consider the OUC’s franchise fee as a real franchise payment.

. The City of Jacksonville receives 30% of its utility’s gross revenue. In an extreme case, there may arise the specter of a tax-free town made wealthy by its utilities operations both inside and outside its political limits.

. In re Permian Basin, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Federal Power Comm’n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

. In re Petitions of Burlington Elec. Light Dep’t, 135 Vt. 114, 373 A.2d 514 (1977); In re Wanakah Water Co., No. 24511 (N.Y. P.S.C. March 26, 1968).

. Federal Power Commission, Statistics of Publicly Owned Electric Utilities in the United States 1973 (1974).

. Re Municipality of Anchorage d/h/a Anchorage Water Utility, 19 PUR 4th 278 (Alaska Pub. Util. Comm’n February 28, 1977).

. Hamler v. City of Jacksonville, 97 Fla. 807, 122 So. 220 (1929); Edris v. Sebring Util. Comm’n 237 So.2d 585, cert. denied, 240 So.2d 643 (Fla.1970); 12 E. McQuiilin, Municipal Corporations § 35.37a (1970).

. Columbus S. Ohio Elec. v. Public Util. Comm'n of Ohio, 58 Ohio St.2d 120, 388 N.E.2d 1378 (1979).

. The expert witness from the PSC expressly refused to answer this question.

. Government owned municipals are considered by authorities to foster lower rates in private utilities because of lower rate competition. R. Heilman, Government Competition in the Electric Utility Industry — A Theoretical and Empirical Study 39 (1972). In this case Orlando Utilities Commission has disproved the norm.

. “A reasonable rate is one that falls within a ‘zone of reason’ ... it is a field, and not a mathematical point.” Wichita Gas Co. v. Public Serv. Comm’n, 2 F.Supp. 792, 799 (D.Kan.1933), modified, 290 U.S. 561, 54 S.Ct. 321, 78 L.Ed. 500 (1934). See also Banton v. Belt Line R. Corp., 268 U.S. 413, 45 S.Ct. 534, 69 L.Ed. 1020 (1925); 64 Am.Jur.2d Public Utilities § 190 (1972).

. City of Pompano Beach v. Oltman, 389 So.2d 283 (Fla. 4th DCA 1980).

. Rosalind does not dispute the amount of costs — $8,624.67.

. § 57.041, Fla.Stat. (1979).