484 So.2d 1333 (1986)
Michael HARAC, Appellant,
v.
DEPARTMENT OF PROFESSIONAL REGULATION, BOARD OF ARCHITECTURE, Appellee.
No. 85-319.
District Court of Appeal of Florida, Third District.
March 11, 1986.
*1334 Howard Hochman, Miami, for appellant.
Jim Smith, Atty. Gen., and John J. Rimes III, Tallahassee, Asst. Atty. Gen., for appellee.
Before BARKDULL, BASKIN and FERGUSON, JJ.
FERGUSON, Judge.
Appellant, an applicant for an architecture license, seeks review of a final order of the Board of Architecture which denies his application.
In June 1981 Harac sat for the Florida Architecture Examination. He had passed the written examination which tests general knowledge, and had completed the internship requirements. However, on the design examination he received a failing grade, and for that reason he was declared ineligible for registration as an architect.
For the design examination,[1] three graders evaluate each applicant's solution using *1335 the holistic grading method. The Grader's Manual used in connection with the examination provides for the selection of twenty training solutions which exemplify the level of competency and accomplishment required for each holistic score. Scores of 0, 1, and 2 are failing; scores of 3 and 4 are passing. The graders are required to conform the severity and emphasis of their grading to the training solutions. The Grader's Manual cautions against judging according to an imaginary ideal solution, and the quality of an examinee's solution is to be measured against the quality of solutions provided by other examinees. Graders are expected to react based on first impressions, giving the examinee the benefit of any doubt.
Scores of 1, 2 and 3 were given to Harac's solution  one passing and two failing. He was thereupon given an overall failing grade which he sought to have reviewed in an administrative hearing pursuant to section 120.57, Florida Statutes (1985).
The parties agreed, at the outset of the hearing, that a score of 1 was invalid and should not be considered.[2] Harac's two valid scores as assigned by graders, for the purpose of the hearing, were a 3 and a 2.
Evidence presented at the hearing was also divided. Charles Sieger was received as an expert in architecture. He conducted an evaluation of Harac's solution by studying it and then simultaneously blind scoring several training solutions and Harac's solution. Sieger considered both passing and failing solutions before and after grading Harac's solution. He determined that there were some design flaws in Harac's solution, but that the solution was buildable if minor changes were made. Herbert Coons, an expert grader for the 1981 design examination, also testified. Coons did not evaluate Harac's solution against or in comparison to the training solutions; nevertheless, he testified that he would have given the solution a failing grade of 2.
Coons' reasons for his decision included the following: (1) space was lost on the designed building's interior because Harac did not abut the building with the existing structures; (2) one of the stair towers opened to the outside; (3) toilets were added in the lobby which were not a program requirement; (4) the toilets badly restricted use of the lobby as a display area; and (5) the program called for a service door which was not shown in Harac's solution. Despite the deficiencies he noted, Coons stipulated that Harac's solution was buildable.
The hearing officer's recommended order recited the following pertinent findings: (1) Harac's solution demonstrated minimum competence in site planning and design; (2) the Board of Architecture (Board) submitted no evidence of substantial program violations or other factual basis to justify its grade of 2 for Harac's solution; and (3) the Board offered no record evidence to suggest that the public health, welfare, or safety would be endangered or compromised in any way by awarding a passing grade to Harac's design solution. The order recommended that Harac should be deemed to have passed the design examination and be qualified for registration as an architect by the State of Florida. The Board did not file exceptions to the findings of facts.
The hearing examiner essentially rejected the testimony of Coons and adopted that of Sieger, as a third examiner. It was agreed that Sieger's evaluation procedure possessed substantial validity within the holistic testing method and was as close to the original grading format as possible without reconvening the original graders and trainers. Coons failed to grade Harac's solution against or in comparison with the training solutions as is required by the Grader's Manual. The examiner also noted Coons' propensity to grade severely as evidenced by the uncontroverted evidence that Coons gave failing grades to training solutions *1336 which had been given passing holistic grades of 3 and 4.
At the meeting to review the examiner's recommended order, five members of the Board conducted their own review of Harac's design solution. The Board members regraded the solution and, based upon their independent grading of the solution, rejected certain findings of fact and conclusions of law contained in the hearing officer's recommended order. The Board substituted the following for the hearing officer's findings:
[Harac's] failure to abut the building to other structures resulted in a significant deviation from program requirements and further his addition of significant program features not required of the candidates such as the bathrooms on the first floor, in addition to several other minor areas of difficulty noticed by [the Board's] witness Coons resulted in significant errors in the design solution submitted by [Harac].
The Board's substituted conclusions of law included the following:
Insofar as the expertise of the majority of the Florida State Board of Architecture based upon its members' knowledge as experienced graders of the examination in question that the deviations of [Harac's] solution from the program's requirements were of such a nature as to evidence failure on the part of the applicant to accurately comprehend the requirements of the examination and to meet the level of expertise necessary for minimum competence as a Registered Architect in the State of Florida. This determination is based upon a review of the complete record, as well as the above mentioned professional knowledge of the majority of the Board voting to make this determination. In the opinion of the majority of the Board, the examination in question should have received a 2. A (failing) grade.
Three members of the Board agreed with the Board's substituted conclusions. Two Board members voted to adopt the examiner's recommended order.
The Board concedes that the hearing officer's findings on facts are supported by substantial and competent evidence. The final order which rejects the hearing officer's findings and conclusions is based upon a "special expertise" exception to the rule that a reviewing agency may not reject or modify the hearing officer's findings unless the agency determines that the findings are not based upon competent substantial evidence. See § 120.57(1)(b)9, Fla. Stat. (1985). The exception permits a board comprised of members who have expertise in the subject area to reach its own conclusions. The special expertise rule may be invoked where the dispositive facts are not susceptible to ordinary methods of proof, and where the decision of the Board is one which impacts on the public health and safety.
The Board relies mainly on Johnston v. Department of Professional Regulation, Board of Medical Examiners, 456 So.2d 939 (Fla. 1st DCA 1984) and McDonald v. Department of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977), cert. denied, 368 So.2d 1370 (Fla. 1979). The Board contends that it has been given broad discretion in testing for licensure, unlike its more limited function where it is called upon to review disciplinary action against a licensee, and that in determining the competency of an applicant it may employ the expertise of its members and reject factual and legal determinations of hearing officers where, as here, competency is not susceptible to usual means of proof.
Harac argues that the authorities relied on by the Board do not dictate that the hearing examiner's conclusions be rejected because (1) the dispositive facts before the examiner were susceptible to ordinary methods of proof, (2) no considerations of public health and safety are implicated in Harac's design solution, and (3) the Board never articulated any such policy considerations in rejecting the examiner's findings. He contends that in finding his solution comparable to the passing training solutions but then rejecting the hearing officer's *1337 conclusions, the Board has arbitrarily rejected the holistic grading format.
Two threshhold questions which must be addressed are: (1) whether the design competency of an architectural license applicant is susceptible to ordinary methods of proof; and (2) assuming the applicant's design competency to be an area where the Board may apply its special expertise, whether the Board's order adequately explicates policy reasons  related to the health, safety, and welfare of the public  for overriding the hearing officer's conclusions.
The cases relied upon by the Board are not supportive of its actions. Johnston v. Department of Professional Regulation, Board of Medical Examiners is, in fact, more supportive of Harac's arguments. There, the court found that an issue presented in the context of the highly specialized area of medicine did not, of itself, permit the Board of Medical Examiners to substitute its findings and conclusions for those of the hearing officer.
As was the case in Johnston, the circumstances here do not present a unique question that is not susceptible to ordinary methods of proof, resolution of which will permit the Board to substitute its findings for those of the hearing examiner, where his findings are based upon substantial evidence in the record. Although the determination of design competency in architecture requires specialized knowledge and experience, it is not so unique so as to defy ordinary methods of proof in formal adversarial proceedings.
The Department of Professional Regulation (Department) has obviously adopted the National Council of Architectural Registration Boards' (NCARB) testing format which recognizes that some subjectivity is inherently part of the examination. But the testing system seeks to minimize professional bias of individual graders by a training and testing format which it deems essential to fairly uniform results. The existence of a structured testing and grading system, we think, evidences the Department's acceptance of a method of proving design competency by ordinary means. On that basis alone the applicant's case is even stronger than was that of the physician in Johnston. Further, Coons' retesting of the applicant in this case was not in accordance with the approved test procedures, which justified the examiner's rejection of his opinion.
In McDonald v. Department of Banking and Finance, the court vacated an order of the Department which denied an application to organize and operate a bank. It held that the Department's final order did not justify its rejection of the hearing officer's findings and conclusions, as was required by the Administrative Procedure Act, section 120.57, Florida Statutes (Supp. 1976). This case is similar to McDonald in the sense that there has been a rejection of a hearing officer's conclusions without a clear explication of policy reasons.
The Board's rejection of the hearing officer's findings of fact, which were based on substantial competent evidence, without stating any policy reasons would require, at the least, that the order be vacated and the proceeding remanded. McDonald. But it is equally clear that the Board's decision was based on facts which do not materially implicate public health, safety, and welfare considerations. The Board's determination that Harac should not be licensed, as set out in its order, was based primarily on a failure to abut his building to an adjacent building. It concluded:
Further the majority of the Board determined that the examination in question would not be a passing solution under the terms of the program requirements as given to the candidates insofar as a gross error existed in the failure of [Harac] to comply with the program by not designing his building to properly relate to adjacent buildings. This failure was specifically in light of the fact that [Harac] failed to abut his building to adjacent buildings and left unsightly and generally useless alleyways and walkways between the buildings which could create health and safety hazards. [e.s.]
*1338 The Board's order contains no explanation as to how Harac's decision to separate the buildings and to build a walkway in between created a health and safety hazard. Harac testified that he deliberately elected not to abut the new structure to an adjacent structure because of a lack of information as to the footings of the adjacent structure. Examiners for both sides testified that information as to the footings of the adjacent structure, not given as part of the test, would be needed in order to properly abut the structure.
The NCARB's Design Testing Handbook gives examples of factors that serve the interests of public health, safety, and welfare. Failure to abut adjacent structures, while clearly a matter of economical construction, is expressly not a matter perceived as affecting the public safety or health. See supra note 1. The Board's conclusory statement to the contrary is inadequate as a justification for overriding the examiner's detailed finding that Harac's design solution was safe. See § 120.57(1)(b)9, Fla. Stat. (1985).
Ordinarily one who fails a licensure examination would shoulder a heavy burden in proving that a subjective evaluation by an expert is arbitrary. See Sanitarians' Registration Board v. Solomon, 148 So.2d 744 (Fla. 1st DCA) (boards empowered to issue licenses to persons wishing to engage in particular profession usually exercise discretionary function in such matters, and courts will not interfere unless applicant proves arbitrary abuse amounting to virtual refusal to perform duty), quashed on other grounds, 155 So.2d 353 (Fla. 1963); see also State ex rel. Topp v. Board of Electrical Examiners for Jacksonville Beach, 101 So.2d 583 (Fla. 1st DCA 1958) (where city examining boards conduct examinations fairly and uniformly in accordance with their own rules and regulations their judgment as to proper grading of such examinations will not be disturbed by courts unless clearly shown to be devoid of logic and reason).
This case presents a peculiar scenario where one of three required grades was concededly invalid and the remaining two grades were divided on the question of the applicant's design competency. The hearing examiner did not thrust himself impermissibly into the role of the third examiner, but instead selected a tie-breaking grade from the divided opinions of two experts who regraded Harac's examination. One examiner's evaluation procedure came as close as possible to the original testing format without reconvening the original graders and trainers. It was accepted by the examiner over the opinion of the second grader whose grading method was not in accordance with the Board's approved grading procedure. Conformity with the testing and grading rules was a correct basis for selecting one opinion and rejecting the other. The Board's subsequent substitution of its judgment for that of the graders, based on a regrading not in accordance with the testing format, was devoid of logic and reason. See State ex rel. Topp v. Board of Electrical Examiners for Jacksonville Beach.
Reversed and remanded with instructions to enter an order finding that Michael Harac be deemed to have passed the 1981 Architecture Examination and is eligible to register as an architect licensed by the State of Florida.
NOTES
[1] The following excerpts from the Design Test Handbook, published by the National Council of Architectural Registration Boards, gives some insight into the purpose and method of design testing:

The NCARB Design Test is intended to examine whether a candidate for the profession is equipped with the knowledge, the skill and the ability to deal responsibly with the safety, health and welfare of the people who interact with architecture. These people may be owners or users of buildings... .
* * * * * *
An entry level ability is what the graders look for in the drawings they examine.
* * * * * *
The [testing] process starts by selecting people to prepare the examination, a group of able professionals who are experienced both in architectural practice, and in the examination system. Then comes the selection of a hypothetical project, derived from a real situation, that will include a broad range of problems typically met by entrants into the architectural profession.
* * * * * *
[G]raders are people of experience and judgment.... They assemble in four large groups totaling about 500 people, and prepare for the work of grading in [training] sessions that describe the examination and the factors in it that deal with an architect's responsibility to the public. These training sessions are led by NCARB staff people who also periodically remind the graders of the criteria as they work. The procedure, it is hoped, provides all graders with consensual judgments so that personal biases are minimized in grading.
* * * * * *
Focusing their attention on what they perceive as factors that serve the interests of the public safety, health and welfare, the graders pay a minimum of attention to matters like presentation techniques and the refinements of economical construction and detail... . [Building and handicapped-access] code compliance is an important touchstone... . [A] large number of passing submissions to the 1981 Test placed the stair tower entrances too close together, and very few provided a required stair to the roof of the building.
* * * * * *
One of the chief distinctions between architects and other members of the construction industry is that [architects] are considered artists.
[2] A score of 1 is proper only where the examinee's solution is incomplete. Harac's solution was complete.