SCHWARTZ, Chief Judge.
The South Florida Cargo Carriers Association seeks review of the Final Order of the Pilotage Rate Review Board, set out in the appendix, which, pursuant to the rate making authority granted by section 310.151, Florida Statutes (1997), ordered an increase in the rates the carriers must pay members of the appellee Port Everglades Pilots’ Association for their services at the port of Port Everglades. The Carriers contend that the Board improperly substituted its judgment for that of an administrative law judge who had, after a section 120.57(1), Florida Statutes (1997), hearing, recommended that the pilotage rates be de creased instead. We affirm.
In this court the Carriers essentially make two separate, but closely intertwined, arguments for reversal. As to the claim that the Board improperly sustained several of the Pilots’ exceptions to various findings and conclusions of the ALJ which tended to denigrate the importance and value of the work of the pilots at Port Everglades (see final order at pages 10-14), we find that these contentions are either without factual merit, do not involve issues which affect the ultimate result and thus present no more than “harmless administrative error,” § 120.68(7), Fla. Stat. (1997); Department of Bus. Regulation, Div. of Pari-Mutuel Wagering v. Hyman, 417 So.2d 671 (Fla.1982), or both.
Its much more significant argument, however, is that the case falls on the fact-finding rather than the policy-making side of the divide described in McDonald v. Department of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977), between those administrative decisions in which the ALJ’s nisi prius role predominates and those in which the expertise of the reviewing agency should prevail. From this, the appellant claims that the Board’s ultimate conclusion as to the appropriate pilotage rate represents an unlawful replacement of its own views for those of the ALJ. Although we confess that we have found the process helpful in our own consideration of a difficult problem in a field not so familiar to this court as to others, we see no reason to burden the Southern Reporter with a tedious reinvention of that which has already been well-crafted by that famous wheelwright, Judge Robert Smith, in McDonald, 346 So.2d at 569. It is enough to say that, largely for the reasons stated by the Board itself, and primarily on the authority of the Florida rate making decisions, see Chiles v. Public Serv. Comm’n Nominating Council, 573 So.2d 829, 832 (Fla.l991)(“[R]atemaking is, in our view, a *393 legislative, rather than an executive or judicial, function.... ”); Rosalind Holding Co. v. Orlando Utilities Comm’n, 402 So.2d 1209 (Fla. 5th DCA 1981), review denied, 412 So.2d 469 (Fla.1982); City of Pompano Beach v. Oltman, 389 So.2d 283, 286 (Fla. 4th DCA 1980)(“Courts may not engage in rate making, since .(his is an unlawful incursion in the legislative arena.”), review denied, 399 So.2d 1144 (Fla.1981)[1]; see also Utilities, Inc. v. Florida Public Serv. Comm’n, 420 So.2d 331 (Fla. 1st DCA 1982), we agree with the Board that resolution of the ultimate issue in the case, the determination of fair pilotage rates, was conferred by the legislature upon it and not the ALJ. Because the Board therefore properly asserted its authority over that issue, and because its conclusions (see final order at pages 22-33) are supported by a reasonable view of the record and the underlying policy considerations which it had a right to find and adopt, and with which this court may not interfere, Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); McDonald, 346 So.2d at 569, the order below is
Affirmed.
APPENDIX
STATE OF FLORIDA DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION PILOTAGE RATE REVIEW BOARD PRRB CASE NO. 96-03, 96-03A and 96-03B
DOAH Case Numbers 97-3656 and 97-3657
In Re: Application of Port Everglades Pilots’ Association for Rate Increase In Port Everglades
In Re: Application of South Florida Cargo Carriers Association, Inc. for Rate Decrease in Port Everglades
In Re: Application of Discovery Sun Partnership d/b/a Discovery Cruise Line for Rate Decrease in Port Everglades[1]
FINAL ORDER
This cause came on to be heard before the Pilotage Rate Review Board (Board) at regularly scheduled meetings held in Fort Lauderdale, Florida on April 29, 1998 and in Boca Grande, Florida on May 19, 1998, pursuant to a Recommended Order entered by ALJ Linda M. Rigot on February 24,1998.
Exceptions to the Recommended Order were filed by the Port Everglades Pilots’ Association (PEPA). Responses to the Exceptions were filed by the South Florida Cargo Carriers Association, Inc. (SFCCA). Both PEPA and SFCCA appeared at the Fort Lauderdale meeting through counsel and extensive argument was heard on the Exceptions. The Board’s rulings on the Exceptions, made after a review of the complete record (including the prehearing stipulation, the transcript, exhibits and the submissions of the parties), are set forth below.
I
A
Preliminary Statement-The Standards to be Applied in Reviewing the Findings of Fact Contained in a Recommended Order
It is a settled rule of administrative law in this state that the findings of fact of an *394 administrative law judge may not be rejected or modified, “unless the agency first determines from a review of the entire record, and states with particularity in order, that the findings of fact were not based on competent substantial evidence.” Section 120.57(l)(j), Florida Statutes. Accord Belleau v. Dept. of Environmental Protection, 695 So.2d 1305 (Fla. 1st DCA 1997); Martuccio v. Dept. of Professional Regulation, 622 So.2d 607 (Fla. 1st DCA 1993); Fla. Dept. of Corrections v. Bradley, 510 So.2d 1122 (Fla. 1st DCA 1987).
Florida ease law holds that an agency reviewing a recommended order is not authorized to reevaluate the quantity and quality of the evidence presented as at DOAH final hearing beyond a determination of whether the evidence is competent and substantial. Brogan v. Carter, 671 So.2d 822, 823 (Fla. 1st DCA 1996). A reviewing agency may not reweigh the evidence, resolve the conflicts therein, or judge the credibility of witnesses, as those are evidentiary matters within the province of the ALJ as the finder of the facts. Martuccio, supra, at 609; Heifetz v. Dept. of Business Regulation, 475 So.2d 1277, 1281 (Fla. 1st DCA 1985). Consequently, if the record of the DOAH Proceedings discloses any competent substantial evidence to support the findings of fact made by the ALJ in the Recommended Order, the Board is bound by such factual findings. Bradley, supra, at 1123.
There is, however, a fundamental difference, first elucidated in McDonald v. Department of Banking and Finance, 346 So.2d 569, 578-579 (Fla. 1st DCA 1977), between evidentiary findings of fact, which involve resolving conflicts of perception, judging credibility of witnesses and drawing permissible inferences therefrom and those ultimate factual findings which are usually couched in terms of statutory or rule language and which resolve the legal issues between the parties.[2]
As the court in McDonald, supra, stated at 346 So.2d at 579 an ALJ’s findings as to credibility, weight and other matters which are susceptible of “ordinary methods of proof [sic] “should be accorded great deference. However, the court went on to hold that an ALJ’s findings regarding matters of opinion and issues which must be resolved by reference to agency expertise, because they are “infused by policy considerations,” are entitled to agency deference but with “correspondingly less weight.”[3]
The agency must be circumspect, however, in exercising its authority to reject an ALJ’s findings even if they could be labeled as “ultimate findings of fact.” If factual disputes underlying an ultimate issue of fact can be resolved by “ordinary methods of proof’ then an agency may not reject or modify an ALJ’s ultimate factual findings without finding that they also were not supported by competent substantial evidence and complying with the requirements of Section 120.57(1); see Harac v. Dept. of Prof. Reg. Board of Architecture, 484 So.2d 1333 (Fla. 3rd DCA 1986); Dunham v. Highlands County School Board, 652 So.2d 894 (Fla. 2nd DCA 1995).
If in an appropriate instance, the question as to what legal standards should be *395 applied to ultimately resolve the issues involves policy considerations (at least to the extent an agency has discretion to interpret its statutes and rules), it follows that an ALJ’s findings as to such mixed questions of law and fact should be entitled to weight only to the extent they correctly apply the agency’s interpretation of its statutory mandate, not simply the interpretation of that mandate by the witnesses at the hearing or even by the ALJ herself.[4]
The policy reason for not allowing an ALJ’s ultimate findings of fact to always obtain practicable immutability and thus usurp an agency’s ability to explicate its positions and interpretations of law in its own jurisprudence, is clear. Agencies, such as the Board, are appointed to oversee and implement the police power of the state and have obtained expertise in doing so. The agency is well aware of its own history and policy, as well as the legal positions set forth therein. ALJ’s are likely not to have this intimate familiarity with the policy issues that comes with enforcing a regulatory scheme on a regular basis.
Bearing the aforementioned principles in mind the Board hereby renders its rulings on the Exceptions.
B
Rulings on Exceptions
1. Rejection of PEPA’s Exceptions
* * *
2. Acceptance of PEPA’s Exceptions
The Board accepts in part PEPA’s Exception 3. The Exception addresses Proposed Findings of Fact 25 and 49-52. The Board finds that the ALJ’s finding in the first sentence of Finding of Fact 25 is not supported by competent substantial evidence and, to the extent that the final sentence of Finding of Fact 25 and Findings of Fact 49-52 are based upon that specific finding, they are not accepted by the Board.[5]
Nevertheless PEPA does not dispute that the ALJ’s a[sic] projected range of increase in annual revenue growth from 5.9% and 7.3% at the port is reasonable and is supported by the facts. As a result, the Board, based upon the remaining testimony and data, accepts the ALJ’s projected range for the growth of revenue at the port.
The Board accepts PEPA’s Exception 6 to Finding of Fact 33 to the extent that it objects to the ALJ’s findings that the examination and licensing process of a deep-sea deck officer is comparable to that of a Florida licensed pilot. While the findings of the ALJ in the other areas of “comparability” are accepted by the Board, there was no evidence from any source as to the examination and licensing procedures of phots and deep-sea officers from which the ALJ could have drawn her conclusion.
The Board accepts PEPA’s Exception 8 to Finding of Fact 39 to the extent that it objects to the “explicit” recognition of the similarity of “deep-sea masters and harbor pilots” (emphasis supplied) in 33 CFR Part 407. While the Board would agree that *396 the provision of the CFR compares “deep-sea masters and Great Lakes pilots “(emphasis supplied) it does not, on its face, generally address “harbor pilots.” The remainder of the Finding of Fact appears to be simply a discussion of the CFR provision which, as a provision of law, speaks for itself.
The Board accepts in part PEPA’s Exception 11 to Findings of Fact 56-58. The ALJ’s conclusory statement in the first sentence of FOF 56 that “the job of piloting does not present any serious physical risks” is simply not supported by the record. While the Board accepts the ALJ’s other findings, it is clear (and not disputed by any of the experts in navigation and seamanship) that there are serious risks in piloting in periods of heavy weather and/or at night. The remainder of the Finding is accepted by the Board.
Similarly, the second sentence in FOF 57 regarding embarkation and disembarkation is flawed because of its categorical finding that such actions are not particularly dangerous. Once again, had the ALJ qualified her finding with a reference to “under normal circumstances” or “in fair weather” the statement would be unexceptional and would be supported by the record. The rest of the Finding is accepted by the Board.
The Board also finds that the ALJ’s conclusion in the last sentence of FOF 58 that the Board members were not engaged in a strenuous act when they boarded a vessel at Port Everglades during the initial rate hearing is not supported by any evidence adduced at the hearing. The remainder of FOF 58 is accepted by the Board.
The Board accepts PEPA’s Exception 14 to Findings of Fact 72-74. There was competent substantial evidence in the record to sustain the ALJ’s findings. The findings are, however, struck because the ALJ has failed to give effect to a stipulation (Pre-Hearing Stipulation at p. 9¶ 20.) contained in the Pre-Hearing Stipulation entered into between the parties.[6]
In the Pre-Hearing Stipulation the parties agreed that to certain facts contained in various tables in the Investigative Report did not require proof at the hearing. Notwithstanding this fact, the ALJ found a revised “handle” time in her Recommended Order which was different (1 hour per vessel as opposed to 1.5 hours) than that contained in the stipulation. The Board finds that, as asserted by PEPA, this was error, Schrimsher, supra, 694 So.2d at 863; Coq v. Fuchs Baking Company, 507 So.2d 138, 140 (Fla. 1st DCA 1987).[7]
The Board accepts in part PEPA’s Exception 15. The evidentiary findings in FOF 75-76 are supported by the evidence in this proceedings and are unexceptional. Nevertheless, the provisions of Section 310.151(5)(c), Florida Statutes, specifically grant to the Board the discretion to apply the CPI or other economic indicators to a rate change request. Thus the ALJ’s statement that “the CPI and employment cost index (sic) are not suitable bases of comparison for measuring pilotage rates “does appear to “read out” this discretionary statutory factor from consideration in all rate cases. The Board can not agree with this position as a matter of law.
The Board does find, however, that while not the sole factor in determining the rates in these proceedings that the CPI is of material value in the consideration of *397 the rates to be established at Port Everglades.
C
Conclusion
With the foregoing amendments, the Board accepts the Findings of Fact of the ALJ and the same hereby become the Findings of Fact of the Board.
II
CONCLUSIONS OF LAW
The Board accepts the A-LJ’s proposed Conclusions of Law 77-78, 80-82, 86 and 88. The Remainder of the AL J’s proposed Conclusions of Law are rejected, modified or revised as set forth below.
A
Preliminary Statement
1. General Observations and the Statutory Framework
Initially the Board deems it appropriate to set out the parameters within which it sets pilotage rates.
The Legislature has specifically recognized that pilotage rates must be set by an independent body and that market forces should not be the arbiter of what rates are charged in the various ports of Florida. The Legislature has also recognized that the services provided by pilots are “essential to the economy and the public welfare” and that “a large capital investment” is required of pilots in order to provide the required services (Sections 310.0015(1) and (2), Florida Statutes).
In addition the rate setting system exists to “provide pilots with reasonable revenues, taking into consideration the normal uncertainties of vessel traffic and port usage.” (Section 310.0015(3), Florida Statutes)[sic] Thus the Board views its primary duty as being to set rates that will guarantee the continuation of the services1 provided by pilots at the present high degree of professionalism and quality.
As the Florida Supreme Court has stated, the standard which an agency must adhere to in setting rates to be charged the public by a regulated utility or industry is relatively straightforward-albeit judgmental in nature:
The rate of return which public utility companies may be allowed to' earn is a question of vital importance to both rate payers and investors. An inadequate return may prevent satisfactory services to the public and concomitantly disappoint investors who will look for alternative sources of investment. The Public Service Commission [here the Board] is given the power to fix the return within certain 'limits. That return cannot be set so low as to confíscate the property of the utility, nor can it be made so high as to provide greater than a reasonable rate of return, thereby prejudicing the consumer. United Telephone Co. of Fla. v. Mayo, 345 So.2d 648, 653 (Fla.1977).
The setting of rates of pilotage is governed by the same general precepts-see Section 310.151(5)(a), Florida Statutes-modified to specifically address piloting.[8]
The difference between the regulation of pilotage rates and those of other “utilities” is primarily the difference between setting rates of return for highly capital intensive businesses such as those providing electricity, telephone or water and a business/profession which is essentially service oriented.[9] The Legislature recognized this fact in it delegation of rate setting authority to the Board.
*398 It is the admonition in Section 310.151(l)(a), Florida Statutes, which is the prime consideration of the Board in setting rates of pilotage. The statutory “factors” set forth in Section 310.151(5)(b), Florida Statutes, are matters which the Board must consider in its rate setting but they do not control the Board’s decision.[10] Finally, the Board is given the discretion to consider the Consumer Price Index or other comparable economic indicators but may not use such information as the sole factor in setting rates of pilotage.[11]
2. The Case Law Governing Rate Setting and Its Application to the Setting of Pilotage Rates
Before the Board enters into its discussion as to the rates to be set in the pending case it is appropriate for the Board to discuss its view of the rate setting process in the context of Chapter 120 proceedings.
1. The public interest in having qualified pilots available to respond promptly to vessels needing their service.
2. A determination of the average net income of pilots in the port, including the value of all benefits derived from service as a pilot. For the purposes of this subparagraph, “net income of pilots” refers to total pilotage fees collected in the port, minus reasonable operating expenses, divided by the number of licensed and active state pilots within the ports.
3. Reasonable operating expenses of pilots.
4. Pilotage rates in other ports.
5. The amount of time each pilot spends on actual piloting duty and the amount of time spent on other essential support services.
6. The prevailing compensation available to individuals in other maritime services of comparable professional skill and standing as that sought in pilots, it being recognized that in order to attract to the profession of piloting, and to hold the best and most qualified individuals as pilots, the overall compensation accorded pilots should be equal to or greater than that available to such individuals in comparable maritime employment.
7. The impact rate change may have in individual pilot compensation and whether such change will lead to a shortage of licensed state pilots, certificated deputy pilots, or qualified pilot applicants.
8. Projected changes in vessel traffic.
9. Cost of retirement and medical plans.
10. Physical risks inherent in piloting.
11. Special characteristics, dangers, and risks of the particular port.
12. Any other factors the board deems relevant in determining a just and reasonable rate.
Much discussion in this and in a companion rule invalidation case (DOAH Case # 97-3834RX-appeal now pending before the Third District Court of Appeals [sic], Case # 98-711) has centered around the role of the ALJ in rate setting. The Board believes that, while the ALJ has a vital role to play in recommending action to the Board, that role does not extend to recommending a specific rate of pilotage. The Board has promulgated a rule to that effect (61E13-2.012, F.A.C.).[12]
It is the Board’s position that, not only under Chapter 120 but also all other applicable law, the setting of rates is a legislative function. Thus, while an ALJ’s recommendation is of interest to the Board, it is entitled to no more deference than a recommendation of a special master to the Legislature on a claims bill.[13]
*399 As early as Storrs v. Pensacola & A.R. Co., 29 Fla. 617, 11 So. 226, 228 (1892) the Supreme Court recognized that the Legislature has the constitutional authority to set rates for public conveyances, utilities and services (such as pilotage) and that such legislative authority can be delegated to administrative agencies such as the Board.
Without exception courts have found that the setting of rates is a “legislative” or “quasi-legislative” function, see Miami Bridge Co. v. Miami Bridge Ry. Co., 152 Fla. 458, 12 So.2d 438, 445-446 (1943); Mohme v. City of Cocoa, 328 So.2d 422, 424—125 (Fla.1976); Chiles v. Public Service Commission Nominating Council, 573 So.2d 829, 832-833 (Fla.1991). Indeed, the setting of pilotage rates in Florida has been specifically recognized as a “legislative” or “quasi-legislative” act by federal courts, Jackson v. Marine Exploration Co. Inc., 583 F.2d 1336, 1344-1349 (5th Cir. 1978).[14]
Characterizing rate setting as a “legislative” or “quasi-legislative” act is not without serious import. Because of this characterization, courts reviewing a challenge to the rates set by the Board can only determine if the proposed or existing rates are facially valid. Courts may not engage in rate making themselves since this would [sic] an improper incursion into the legislative sphere, Miami Bridge Co., supra at 12 So.2d 446, City of Pompano Beach v. Oltman, 389 So.2d 283 (Fla. 4th DCA 1980).[15]
As a result of the fact that the setting of rates is a legislative policy function, courts, when reviewing rates for validity, are extremely deferential to the findings of the rate setting body and will not overturn the rates unless they, are unreasonable, confiscatory, discriminatory or are not supported by competent substantial evidence, see Rosalind Holding Co. v. Orlando Utilities Commission, 402 So.2d 1209, 1210-1211 (Fla. 5th DCA 1981) and cases cited therein.[16]
The ALJ’s apparent belief that she was bound either to recommend to the Board that it accept the position of SFCCA or sustain its own preliminary position (see Proposed Recommendation) shows the limitations of setting rates by judicial fiat as *400 opposed to exercising legislative judgment. As the Board has noted in previous, unchallenged rate orders (see for example, Port of Miami (SFCCA/Miami), PRRB Case No. 96-01 at page 8, Ports of Tampa Bay, PRRB Case # 97-01 at page 5), it is the Board’s position that its authority extends to granting a rate decrease or increase, in whole or in part, or to deny the request completely. The Board also asserts its authority to grant relief which is contingent upon actions which must occur in order for the rates to take permanent effect. Any more limited construction of the Board’s rate setting authority could result in the Board being forced to deny a legitimate, fully supported request for a rate decrease or increase because the evidence adduced supported only a portion of the relief requested.
B
THE STATUTORY FACTORS
1. The public interest in having qualified pilots available to respond promptly to vessels needing their service.
This is the most important of the statutory factors and corresponds to the provisions of Section 310.151(5)(a), Florida Statutes. The facts show that the services performed by PEPA at Port Everglades are vital to the continued expansion of a growing port facility.[17] PEPA’s recognition of this fact is evidenced by the addition of two new fully licensed state pilots beginning in 1999. The negative impact of the additional pilots upon average pilot income must be considered by the Board and militates in favor of adjusting the rates accordingly-presuming that port growth continues at its projected rate and that existing income is reasonable.[18]
The ALJ’s ultimate conclusions (COL 79 and 91) are thus rejected largely because they “read out” of the statute any part of rate setting which goes to the subjective valuation of the quality of pilotage services.
2. A determination of the average net income of pilots in the port, including the value of all benefits derived from service as a pilot. For the purpose of this subparagraph, “net income of pilots” refers to total pilotage fees collected in the port, minus reasonable operating expenses, divided by the number of licensed and active state pilots within the ports.
This factor mandates that the Board determine the average net income of pilots at the port. Standing alone it has no other purpose in the rate setting process. Taken with the other factors, the average pilot net income is the single most important *401 item which will be affected by a rate change.
As was noted by the ALJ in her findings of fact the average income of pilots is dependant upon certain factors. First is the number of pilots. Here the Board counts only fully licensed state pilots for this purpose.[19]
As was found by the ALJ, one must also factor in reasonable operating expenses, the value of fringe benefits and retirements plans and the change in gross income derived from the activities at the port over the reasonable future in order to derive the average net income of pilots. The Board has prepared a chart, attached hereto as Exhibit 1, which sets out projections of average pilot net income (I) presuming various rate levels, (2) factors in a projected percentage increase in port income ( + 6% per year) which is within the range set forth in FOF 23-26 and 49-52, (3) includes the present and actual value of all funded and unfunded retirement plans (FOF 14-19) and other fringe benefits (FOF 55), and (4) includes as net income those discretionary expenses which should not be considered as operating expenses for rate purposes (FOF 9-12). The remainder of the claimed operating expenses, which were undisputedly reasonable, (FOF 27) were removed before determining average net pilot income.
3.Reasonable operating expenses of pilots.
As was discussed above, PEPA’s operating expenses (when properly limited) are, according to all parties, reasonable. The Board does note, as was found by the ALJ (FOF 30), that PEPA members spend considerable (though unquantified) time performing administrative and clerical services related to pilotage. While the Board can assign no specific dollar value to the unpaid services,, it does consider the fact that paying non-pilot employees to perform the same tasks would, if reasonable, be a legitimate operating expense.
4. Pilotage rates in other ports.
As was found by the ALJ (FOF 28-29), Port Everglades pilotage rates are low, in absolute terms, among Florida and regional ports. As the ALJ noted, and as had earlier been found by the Board in its Initial Order, however, rates do not exist in a vacuum. Low rates , are indicators that a rate increase may be appropriate, but only when measured against the net income derived from the rates.
Similarly, relatively high rates do not automatically justify a rate decrease. The time spent in actual piloting per vessel, the size of the vessels, the number of handles which a phot can perform in a work shift, as well as the amount of reasonable operating expenses all bear upon the validity of comparisons of rates in one port to those of another.
In the instant case the most that can be said is that the present rates in Port Everglades, even with a modest rate increase, would not, on their face, be out of line with other ports.
5. The amount of time each pilot spends on a actual piloting duty and the amount of time spent on other essential support services.
As was found by the ALJ (FOF 30) pilots spend four weeks on/four weeks off in direct piloting and support services. This is not unreasonable given the hours üpon which a pilot may be on-call as well as on-station during the pilot rotation.
The Board considers this factor as useful because it allows the Board to quantify *402 the number of professional workdays for pilots at a port. In the instant ease, as per the ALJ’s findings, PEPA pilots work approximately 182 days per year in activities covered by this factor.
6. The prevailing compensation available to individuals in other maritime services of comparable professional skill and standing as that sought in pilots, it being recognized that in order to attract to the profession of piloting, and to hold the best and most qualified individuals as pilots, the overall compensation accorded pilots should be equal to or greater than the available to such individuals in comparable maritime employment [sic]
This factor has been a hotly contested issue in every rate proceeding in which the Board has participated. The Board reads this factor to initially require a determination as to whether there are comparable maritime professions to that of harbor pilot. If there are, then “the overall compensation” to pilots (the Board reads this term as equivalent to “average net income”) can be no less but may be greater than that received by those engaged in such “comparable” professions.
As was found by the ALJ (FOF 32-40) there is considerable evidence that pilots are “comparable” to certain senior deep-sea bridge officers.[20] The Board has accepted the ALJ’s findings (COL 84) and construes the term “comparable” in the statute to mean “similar” as opposed to “equivalent.” Moorehead v. Department of Professional Regulation, Board of Psychological Examiners, 550 So.2d 521, 522 (Fla. 1st DCA 1989).[21]
Given this fact, the Board accepts the ALJ’s findings (FOF 41) that the top actually earned wage of a master of a U.S. flagged vessel would be approximately $140,000 for approximately 125 workdays.[22] For pilots, who work 182 days per year at piloting, the wage would be correspondingly greater.[23] Thus the ALJ’s conclusion *403 (COL 91) that the rates, if decreased as she recommended, would yield a compensation package “more than double that of comparable professionals” is incorrect unless she was using as her base mark for master/pilot comparison something different than the comparison with the highest paid masters discussed at FOF 41-42.[24]
The Board also recognizes, as did the ALJ (COL 89 recast as a FOF), that pilots, as independent businesspeople, are different from deep-sea deck officers in that pilots are not employees. While the financial risks as small businesspeople which pilots may run are no greater or lesser that [sic] others engaged in small businesses, they do involve a capital risk that employees are not subject to.
It is for this reason that the Board reads this factor as setting only a floor for pilot compensation. As the statute states: “the overall compensation accorded pilots should be equal to or greater than the available to such individuals in comparable maritime employment.” Given this analysis the Board finds that the “floor” is, as was indicated by the ALJ, the wage rate paid to the highest paid U.S. masters (approximately $203,000 ($140,000/125 days times 182 days)).
7.The impact rate change may have in individual pilot compensation and whether such change will lead to a shortage of licensed state pilots, certificated deputy pilots, or qualified pilot applicants.
There was no evidence (FOF 47-48) that any of the proposed rate changes would materially lead to a shortage of qualified pilots. While it is probably true that higher rates translating to higher income will increase the quality and number of the pool of applicants for any open position, there seems no competent evidence that this factor would justify a rate increase or militate against a reasonable rate decrease. Thus the Board accepts the ALJ’s finding (COL 86) on this issue [sic]
8. Projected changes in vessel traffic.
As was found by the ALJ (FOF23-26 and 49-52), the revenue in the port will likely increase at a rate of 5.9-7.3 per cent per year in the foreseeable future. Since it is likely that vessel traffic will at least increase at a comparable rate based upon historical trends (FOF 25), it appears that gross income will increase and, as will occur in 1999 when two additional pilots are added, more pilots may become necessary to handle the increased vessel flow.
The continued increase in vessel traffic is thus an argument in favor of adjusting rates to reflect the need for new pilots. Each new pilot cuts into average phot net income. Unless the incremental revenue increase is equal to or exceeds the dimin-ishment to average net income which results when a pilot is added to the number of pilots who will divide the net revenue, then pilot income will drop even though additional pilots are needed to service the customers of the port. Thus, assuming that average net pilot income is presently reasonable, a rate increase can be justified by the increased vessel traffic-which results in a need for additional pilots.
9. Cost of retirement and medical plans
The Board has accepted the ALJ’s findings (FOF13-20, 53-55) regarding the non-cash benefits and the provisions for capital return presently existing in PEPA. The Board does not consider the capital investment buy-in and later return as a benefit but rather as a simple contribution to capital and repayment thereof.
The remaining noncash benefits are generous and, while appropriate, do not need *404 to be increased. They are thus no justification for an additional increase in rates.[25]
10. Physical risks inherent in piloting.
The Board has largely accepted the findings of the ALJ (FOF 56-58) relating to the day-to-day risks of piloting which exist in normal conditions at the port. As noted above, however, the evidence does not support a finding that piloting at the port in abnormal weather conditions or at night is not inherently more risky than standing a watch on a vessel at sea. This is primarily due to the constant requirement that pilots must embark and disembark from vessel in virtually all types of weather and at all times of the day and night. For this reason the Board has accepted that the rates must reflect these inherent risks.
11. Special characteristics, dangers, and risks of the particular port.
As was found by the ALJ (FOF 59-70), Port Everglades, while subject to its own idiosyncracies, (all ports are by definition unique in some respects) is not a particularly difficult port to pilot a vessel. In addition, weather (outside of storm seasons) is generally good and visibility is acceptable. The Board therefore agrees with the ALJ (COL 87) that there is nothing unusually dangerous about the port itself.
12. Any other factors the board deems relevant in determining a just and reasonable rate.
The Board finds it necessary to address an undiscussed issue here. As was found by the ALJ and accepted as a conclusion of law by the Board, the present value of the unfunded pension plan (FOF-14-19), must be considered as part of net average pilot income. Nevertheless the Board recognizes that this “income,” while it will ultimately be quite valuable, is not a tangible current or liquid asset which is readily available to pilots.
The value of the unfunded pension plan as to each pilot is in reality a “book” asset until a pilot reaches the retirement plan’s kick-in date after twenty years of service. The Board thus is inclined to limit the weight given to this type of income when setting rates.
The Consumer Price Index and other economic indicators
The Board agrees with the ALJ’s conclusion (COL 88) on this issue. There was no evidence that the costs of labor or consumer prices have risen so as to significantly impact the net income of pilots. Operating and living expenses have increased but the corresponding increase of revenue at the port has resulted in little impact upon pilot net income.
Ill
SETTING THE PILOTAGE RATES
After addressing all of the factors and the statutory directions, the Board concludes that a gross rate increase of 5.5% is justified. Thus the requested non-draft and tonnage rate increases are granted as requested by PEPA. The draft and tonnage rates are increased to the following: draft: $11.49 per draft foot with foot with a minimum of 12 feet; tonnage: 3.08 cents per International Gross Registered Ton (GRT) with 2,500 GRT minimum (applies to every movement of the vessel and is based on the highest published tonnage).
Average pilot income is not unreasonable at present levels (1998) so long as the income includes the value of discretionary expenditures and the unfunded pension plan. While this decision by the Board involves the application of its judgment, the quality of services provided by PEPA, the competitiveness of the rates at the port, the inherent dangers of piloting and the responsiveness of PEPA to needed *405 increases in the number of pilots at the port justify this finding.[26]
The number of pilots will increase by the year 1999 from 14 to 16. This increase is necessary and appropriate as a result of increased traffic at the port and should not operate to lower average net pilot income as a result of dividing the income pie among more pilots.
The fact that the Board of Pilot Commissioners has authorized additional pilots as per Section 310.061, Florida Statutes, based upon the “supply and demand for piloting services and the public interest in maintaining efficient and safe piloting services” makes the reason for this policy decision of the Board clear. For the Board to authorize a rate decrease or refuse a rate increase at the same time the number of pilots are increased in a port as a result of increased use of the port would operate as a disincentive to the various pilot associations to seek additional pilots because of the resultant negative impact on average net income.
The impact of adding back to pilot income the present value of the unfunded pension plan acts to skew actual pilot net available income. When the actual cash income available to pilots is looked at in the various scenarios set forth in the attached chart it is apparent that, given the increase in the number of pilots, present real net pilot income drops dramatically if a 10.62% rate decrease is authorized (from $358,000 in 1998 to $284,000 in 1999) and materially diminishes even if there was no change in rates (from $358,000 in 1998 to $340,000 in 1999). The abrupt material disruption to pilot income caused by such a reduction is simply unacceptable to the Board.
The Board finds that the services provided at the port are being provided capably and without resort to any rate increase requests to fund needed improvements. The pilots have taken it upon themselves to fund their operation out of operating revenue and have not and will not seek any rate increases to cover new expenditures. This militates in favor of keeping revenue high enough to allow for PEPA to maintain this commitment as opposed to other ports where increases have been sought and granted to maintain the quality of the pilotage infrastructure (Port of Jacksonville, Application of St. John’s Bar Pilot Association, PRRB Case # 96-02).
Finally, contrary to the assertion of the ALJ (COL 85), the fact that pilots at Port Everglades make more than comparable maritime professions does not make them “overcompensated.” The law does not tie pilot compensation to other maritime professions other than to set a “floor” for pilot compensation.
The Board addresses the level of what is appropriate pilot compensation above and beyond the “floor” by looking at the quality of services provided by the local pilots, the responsiveness of the pilots to changes at the port (such as adding new pilots when necessary), the rates at the port when compared to other Florida and regional ports, and the historical rate of pilot compensation at the port. All of these factors militate in favor of retaining average per pilot income at approximately its present state. A increase in rates would accomplish this task.
Wherefore, based upon the foregoing, the Board modifies its Initial Order in this matter and, beginning the date of filing with .the Clerk of the Department of Business and Professional Regulation, sets the rates of pilotage at Port Everglades as follows (an abbreviated Order setting out the rates in full without the Board’s ratio *406 nale for those rates is attached as Exhibit ‘AO:
1. A draft charge of $11.49 per draft foot with a minimum of 12 feet.
2. A tonnage charge of 3.08 cents per International Gross Registered Ton (GRT) with 2,500 GRT minimum. Applies to every movement of the vessel and is based on the highest published tonnage.
3. Detention of pilots-$100 per hour after the first 5 hour, [sic]
4. Canceled or delayed sailing (not due to weather)-$100 after pilot is dispatched to vessel.
5. Delivering orders or place person on/off vessel — $200.
6. Running lines by Pilot Boat — $100.
7. Shifting — $300
8. Piloting or shifting barges or vessels without motive power and/or steering - 1.5 times draft pilotage fee.
9. Anchor $300 plus draft charge. This charge shall also apply to taking a vessel from anchor, if requested.

. Contrary to the appellant’s position, we find no meaningful distinction between the public utility rate cases and this one. See Jackson v. Marine Exploration Co., Inc., 583 F.2d 1336 (5th Cir.1978).

. Initially, these proceedings included the Application and Petition of Discovery Sun Partnership d/b/a Discovery Cruise Line for a rate decrease at Port Everglades (DOAH Case Number 97-3657 and PRRB Case Number 96-03B). On December 8, 1997, the Administrative Law Judge (ALJ) dismissed Discovery's Petition for Failure to comply with the prehearing order and for failure to participate in the hearing before DOAH. The ALJ’s ruling is adopted by the PRRB and the file on Discovery’s Application is hereby closed and the Application is Denied.

. An ultimate fact is “an outcome determination fact, derived from historical facts by a process which 'implies the application of standards of law.’ It is a mixture of fact and law; fact because it is derived by inference or reasoning from the evidence, and law because the derivation is informed by legal principles and policies, producing a fact of independent legal significance!.]” Summary Judgement Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 470 (1984)(emphasis supplied).

. Thus an agency is not free to simply create its own evidence in place of that presented at a hearing, [sic] it is permitted to draw its own ultimate conclusions, based on a correct legal analysis, from the evidence (especially expert evidence) which has been heard and recorded by the trier of fact, see Colorado State Board of Medical Examiners v. Hoffner, 832 P.2d 1062, 1067 (Colo.App.1992); Dailey v. North Carolina State Bd. of Dental Examiners, 309 N.C. 710, 309 S.E.2d 219, 227 (1983)(and cases cited therein).

. Courts have recognized that deference to agency expertise and policy considerations is appropriate even in matters which on their face could be considered as capable of proof "by ordinary means," see Santaniello v. Department of Professional Regulation, 432 So.2d 84,85 (Fla. 2nd DCA 1983) (agency determination as to what is a "material fact” is entitled to deference); Harloff v. City of Sarasota, 575 So.2d 1324, 1328 (Fla. 2nd DCA 1991) (interpretation and application of factors to be considered in granting water use permit involve mixed questions of law and fact and agency’s expertise is to be deferred to).

. While the finding might be correct if it noted that an expert witness presented by SFCCA asserted that the Port Everglades Master Plan projected the percent increase in total vessel traffic set forth in the finding, the Plan itself contains no such numerical statement. As a result the finding is incorrect.

. The Board finds that a similar PEPA Exception (# 4), based upon another alleged failure to give effect to the Pre-Hearing Stipulation, was not erroneous because the information outside the stipulation which was accepted by the ALJ was introduced by PEPA itself at the hearing. Thus the Board’s position in rejecting Exception 4 is consistent with its position here.

. As was noted by SFCCA in its Responses to the Exceptions, however, the ALJ’s findings in paragraphs 72-74 was not translated to any conclusion of law.

. "In determining whether the requested rate change will result in fair, just, and reasonable rates, the board shall give primary consideration to the public interest in promoting and maintaining efficient, reliable, and safe piloting services.”

. The undisputed evidence shows' that harbor pilots do have a capital stake in their business operation. It is clear, however, that the amount of capital investment and expense in land, buildings, pilot boats, electronics and other forms of infrastructure reflects a smaller portion of gross pilot income than would be present in, for example, an electric *398 utility company. Most of pilot income goes to compensate pilots for the professional services they render to their customers.

.(b) The board shall also give consideration to the following factors:

. "The board may take into consideration the consumer price index or any other comparable economic indicator when fixing rates of pilotage; however, because the consumer price index or such other comparable economic indicator is primarily related to net income rather than rates, the board shall not use it as the sole factor in fixing rates of pilotage.”

. That rule was invalidated by the ALJ and an appeal from that Order is the subject of the aforementioned case in the Third DCA. The Board, while it could rely upon the rule to disregard the ALJ’s recommendation in the instant case because of the automatic stay of the Order pending the appeal, has not done so.

. Chapter 120 requires an agency to defer to an ALJ's recommendation only as to an administrative penalty-a factor not at issue herein, see Section 120.57(l)(j), Florida Statutes.

. Prior to 1994 the function of setting pilot-age rates was conferred upon the Board of Pilot Commissioners. The Legislature created the Board in that year and transferred the sole power to set pilotage rates to it.

. This precept has been made crystal clear in Miami Bridge Co., supra at 12 So.2d 446, where the Court, citing to State ex rel. Young v. Duval County, 76 Fla. 180, 79 So. 692 (1918), discussed how the Legislature could give courts the authority to set rates if it wished but would have to specifically set forth such an authorization in statute.

. The term "competent substantial evidence" was ably defined in De Groot v. Sheffield, 95 So.2d 912, 916 (Fla.1957):
'We have used the term 'competent substantial evidence' advisedly. Substantial evidence has been described as such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred. We have stated it to be such relevant evidence as a reasonable mind would accept as adequate to support a con-elusion. Becker v. Merrill, 155 Fla. 379, 20 So.2d 912[ (1944)]; Laney v. Board of Public Instruction, 153 Fla. 728, 15 So.2d 748[ (1943)]. In employing the adjective 'competent' to modify the word 'substantial,' we are aware of the familiar rule that in administrative proceedings the formalities in the introduction of testimony common to the courts of justice are not strictly employed. Jenkins v. Curry, 154 Fla. 617, 18 So.2d 521 [ (1944)]. We are of the view, however, that the evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. To this extent the 'substantial' evidence should also be 'competent. Schwartz, American Administrative Law, p. 88; The Substantial Evidence Rule by Malcolm Parsons, Fla. Law Review, Vol. IV, No. 4, p. 481; United States Casualty Company v. Maryland Casualty Company, 55 So.2d 741[ (Fla.1951)]; Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126[ (1938)].’

. The ALJ has profoundly misunderstood (COL 90) the import of this factor. The quality of services performed by pilots is of paramount importance in setting pilotage rates. Because the ALJ focused mainly on the amount of average pilot income and found it excessive, she ignored the fact that the value of pilot services-as that of all professional services-has a large component of subjectivity. Since no product is produced by pilots-only a service rendered-its valuation requires not only objective comparisons with similar charges in other ports and professions but also a subjective evaluation of what a quality service is worth to the user. This "legislative" evaluative decision is the essence of pilotage rate setting.

. The ALJ’s finding (FOF # 46) that average per pilot income has decreased because of the increase in the number of pilots at the port is largely correct but misses the point of this statutory factor. The purpose of the factor is to charge the Board with making sure that prompt efficient pilotage service is available at the rates authorized. Thus the decision of PEPA to request an increase in the number of pilots from the Board of Pilot Commissioners because of the need to service the port — and as a result potentially decrease average pilot income is evidence that PEPA is performing its duties appropriately and responding to changes at the port in a positive manner. It is to be noted that none of the parties disputed that the increase in the number of pilots was not warranted by the increase in vessel traffic at the port.

. As was found in the Board’s Initial Order setting the rates of pilotage in Port Everglades and in other unchallenged rate orders, deputy pilots can not be counted as equivalent to state pilots for purposes of determining net pilot income. They must either be considered as an operating expense or regarded as a fraction of a state pilot. As the Board also found in its Initial Order, it is the preference of the Board to consider the payment of deputy pilots as an operating expense thus not confusing the net bottom line income of state pilots with individuals who are not "equal” to state pilots for purposes of determining pilot net income in a rate increase case.

. The ALJ has mistakenly assumed (FOF 31, COL 83) that the Board had determined in previous non-challenged orders that pilots are "comparable” only to themselves and thus the Board had "read out” this factor from the statute. As was noted above, Board decisions in nonchallenged rate orders have no prece-dential value. In addition, the Board has held (Ports of Tampa Bay, PRRB Case # 97-01) that pilots are "comparable” in their training to deep-sea officers.
The ALJ has found that the on the job professional duties of pilots and senior deep-sea marine officers are comparable-after the benefit of a full evidentiary hearing. The Board has accepted this finding. It does seem a bit harsh to criticize the Board's pre-hearing position which was rendered when the Board had not then had the benefit of the evidence presented to the ALJ.

. The Board does not dispute the ALJ's conclusion (COL 84) that ships’ masters occasionally engage in piloting as a part of their duties. The ALJ, however, while finding that pilots, by definition, engage in this duty constantly erred in not recognizing the qualitatively different level of skills supplied by pilots to their customers as a result of the local pilots specialized knowledge and standards for licensure. This is a statutory finding by the Legislature and cannot be ignored by the Board-see Sections 310.061-081, Florida Statutes, (setting forth the standards for state licensure of pilots). The differences between pilots and masters are not limited to merely the fact that "pilots climb ladders” to get to and from their job sites.

. The $140,000 figure found in the second sentence of the ALJ’s FOF 41 is based upon approximately 125 workdays/year for a ship master. Pilots at Port Everglades, as found by the ALJ, work 182 days/year at pilotage tasks (four weeks on-four weeks off-see Finding of Fact 30).

. The ALJ's analysis is somewhat flawed because it compares the number of days that ships masters may actually work in an industry-the U.S. Merchant Marine-where the number of berths are declining and where work rules and employment conditions may require the doubling or trebling up of qualified masters in each existing berth with piloting conditions at Port Everglades where the number of vessels that need piloting services is actually increasing. Surely the ALJ was not suggesting that the Port Everglades pilots should voluntarily lower the number of days that they work and take on additional pilots with *403 the additional overhead, simply in order to reach a salary level comparable to deep-sea masters who must work at such levels.

. The ALJ apparently forgot that pilots work a full (182 day) work year in providing pilot-age services as opposed to the 125 day work year postulated for highly paid ship’s masters.

. The Board does note that the unfunded portion of the pilot retirement plan is contingent. A pilot does not get the benefit unless the pilot works for twenty years as a pilot. In addition, the amount is contingent upon the revenue at the port.

. Despite its obvious relevance, none of the parties or their experts were able to point to a comprehensive study of prevailing income rates for pilots in the major ports of Florida, the region or the U.S. as a whole.